## HARTFORD STEAM BOILER INSPECTION & INS. CO. v. PABST BREWING CO.

(Circuit Court of Appeals, Seventh Circuit. October 15, 1912.)

No. 1,850.

1. ACTION (§ 48*)—JOINDER OF CAUSES OF ACTION—TORT AND CONTRACT—WISCONSIN STATUTE—"TRANSACTION."

A cause of action on a policy of insurance to recover for the loss of steam boilers through explosion and one in tort for negligence of the insurance company in making inspection of the boilers, which it agreed to do periodically as an inducement to the insurance contract, arose out of "transactions connected with the same subject of action," the joinder of which is authorized by Rev. St. Wis. 1898, § 2647.

[Ed. Note.—For other cases, see Action, Cent. Dig. §§ 450, 471, 490–510; Dec. Dig. § 48.*

For other definitions, see Words and Phrases, vol. 8, pp. 7060–7062.]

2. INSURANCE (§ 422*)—INSURANCE OF BOILERS AGAINST EXPLOSION—PROXIMATE CAUSE OF LOSS—LIMITATION IN POLICY—"SINGLE EXPLOSION."

Defendant insured six new steam boilers in a building of plaintiff's plant in the sum of $150,000 against loss or damage from explosion; liability "resulting from any one explosion" being limited to $50,000. The boilers were connected in battery with a common header for distribution of steam. Three of the boilers exploded. The explosions were not simultaneous, but the first was followed in rapid succession by the second and third. The direct cause of the initial explosion was not shown further than that there was evidence of defects in each of the boilers. Held, it appearing that the several explosions were of different boilers, that the second and third were plainly incidental and attributable to the first, and while contributing to the damage could not be considered as intermediate and efficient causes of any part of the loss, but that the first was the proximate cause, and there was as matter of law but one explosion within the meaning of the limitation in the policy.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1128, 1134, 1139, 1141; Dec. Dig. § 422.*]

3. INSURANCE (§ 427*)—LIABILITY—"PROXIMATE CAUSE" OF LOSS.

In determining the cause of a loss for the purpose of fixing insurance liability, when concurring causes of the damage appear, the proximate cause to which the loss is to be attributed is the dominant, the efficient one that sets the other causes in operation; and causes which are incidental are not proximate, though they may be nearer in time and place to the loss.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1139–1143; Dec. Dig. § 427.*

For other definitions, see Words and Phrases, vol. 6, pp. 5758–5769; vol. 8, p. 7771.]

4. CUSTOMS AND USAGES (§ 15*)—EVIDENCE—MEANING OF TERMS USED IN POLICY.

Where the question whether the explosion of several boilers in immediate succession constituted a single explosion or a number within the meaning of a provision of an insurance policy was submitted to the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

jury, evidence of the usage with respect to the meaning of the term "explosion," where a number of boilers are referred to, was competent.

[Ed. Note.—For other cases, see Customs and Usages, Cent. Dig. §§ 30–33; Dec. Dig. § 15.*]

5. INSURANCE (§ 422*)—BOILER INSURANCE POLICY—CONSTRUCTION.

Rev. St. Wis. 1898, § 1966—41, provides that no corporation doing business in the state "issuing a policy of boiler insurance shall expose itself to any loss under any one accident to an amount exceeding fifty thousand dollars." *Held*, that a proviso in a policy issued on boilers in the state while such statute was in effect limiting the liability of the company to $50,000 for loss or damage "resulting from any one explosion" must be construed as intended by the parties to make the policy conform to such requirement, and as limiting liability for any one disaster occurring during the term.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1128, 1134, 1139, 1141; Dec. Dig. § 422.*]

6. STEAM (§ 6*)—INJURIES FROM EXPLOSION—LIABILITY—COLLATERAL UNDERTAKING TO MAKE INSPECTIONS.

Although a provision in a policy insuring steam boilers giving the insurer the right to inspect the boilers at any time was solely for its own protection and created no duty to the insured to make such inspections. such duty may arise from representations made as an inducement to the insurance, that it made such inspections periodically by skilled men and reported the conditions found to the insured, and by a long course of dealing in making the inspections and reports, which are relied on by the insured with its knowledge, and it may become liable for negligence in the performance of such duty outside of the contract made by its policy.

[Ed. Note.—For other cases, see Steam, Cent. Dig. §§ 4–11; Dec. Dig. § 6.*]

7. STEAM (§ 6*)—INJURIES—NEGLIGENT INSPECTION OF BOILERS—EVIDENCE.

Defendant insurance company assumed the duty of inspecting a battery of large boilers in plaintiff's plant. A month after the last inspection had been made, three of the boilers exploded, wrecking the building. *Held*, that on trial of an action to charge defendant with liability on the ground of negligent inspection, where there was no direct evidence of any defects in the boilers at the time of the last inspection which were discoverable by the exercise of reasonable care and skill, it was error to admit evidence of cracks which were found in two of the remaining boilers after the explosion, there being no evidence on which it could be assumed that they were not caused by the explosion, and especially where there was evidence tending to show that the cracks were such that it would be impossible to use the boilers at the usual steam pressure.

[Ed. Note.—For other cases, see Steam, Cent. Dig. §§ 4–11; Dec. Dig. § 6.*]

8. STEAM (§ 6*)—INJURIES—CONTRIBUTORY NEGLIGENCE—QUESTION FOR JURY.

Evidence considered in such action, and *held* to require the submission to the jury of the issue of contributory negligence of plaintiff.

[Ed. Note.—For other cases, see Steam, Cent. Dig. §§ 4–11; Dec. Dig. § 6.*]

In Error to the Circuit Court of the United States for the Eastern District of Wisconsin; Arthur L. Sanborn, Judge.

Action at law by the Pabst Brewing Company against the Hartford Steam Boiler Inspection & Insurance Company. Judgment for plaintiff, and defendant brings error. Reversed.

The defendant in error, Pabst Brewing Company, was the plaintiff below in a suit against the plaintiff in error, Hartford Steam Boiler Inspection &

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Insurance Company (as defendant), to recover damages caused by explosions (averred to be several) of steam boilers in plaintiff's great plant in Milwaukee. On trial of the issues to a jury, verdict was rendered in favor of the plaintiff, assessing the damages at $104,178.75—namely, for $97,500 as damages, together with interest thereon—and reversal of the judgment entered thereupon is sought by the defendant below, under this writ of error.

The amount of actual damages suffered by the plaintiff in the disaster was not only uncontroverted, but stipulated between the parties at $97,500, and the numerous assignments of error are directed to questions of law, raised in the course of the trial, in reference (a) to the plaintiff's pleadings, (b) alleged contracts in suit and construction thereof, (c) rulings upon admission and rejection of evidence, and (d) instructions denied or given by the trial court.

The plaintiff's complaint embraces two alleged causes of action: One in tort, charging negligence on the part of the defendant in inspection of the boilers prior to the explosion, and the other for indemnity under a policy of insurance written by the defendant.

For the first cause of action the complaint (as amended), aside from formal matters, avers, as follows, in substance: The defendant for many years has been engaged in the business of insurance on steam boilers and of inspecting such boilers, and promptly reporting the results of such inspection to the insured. It represented and held itself out to the party as skilled in such examinations, for which special knowledge, experience, and skill were required. Prior to July 28, 1908, the date of the insurance policy involved herein, the defendant represented and held out to the plaintiff that it was skilled and expert in such examinations of water tube steam boilers, and solicited and requested plaintiff to enter into a contract of insurance with it on six certain water tube boilers, resulting in the issuance of such policy. The policy so issued contained a provision whereby the plaintiff covenanted and agreed with the defendant to allow the latter to enter upon its premises at all reasonable times and inspect and examine said boilers to determine their condition and safety. The defendant then and there represented that, if the plaintiff entered into the insurance contract, such inspections would be made skillfully, carefully, and at such intervals as might be necessary to determine the safety and condition of the boilers; that upwards of 40 per cent. of the premium to be paid on the policy would be expended in making such inspection; that the results of such inspections would be promptly and truly reported, and the plaintiff kept continuously and accurately informed as to the condition and safety of the boilers. It further avers that the defendant knew that the plaintiff was not skilled, experienced, or expert in making such examinations, and would and did rely on the representations, agreements, and reports of the defendant; that thereupon the plaintiff, relying on such representations, entered into the contract before mentioned, and paid to the defendant the consideration named by it for the making of such inspection and reports, and for the said policy of insurance. Thereupon and thereafter the defendant entered upon the performance of the promises and representations referred to, and visited the premises of plaintiff from time to time for making such inspections up to October 9, 1909, inspecting and examining the boilers and reporting to the plaintiff the results of examinations, pretending and undertaking to keep the plaintiff continuously informed as to their condition and safety. Relying upon the representations, reports, and inspections of the defendant, the plaintiff refrained from making or having made any other expert examinations or inspections, and depended wholly upon the defendant therefor. It further avers that it thereby became the duty of the defendant at all times between July 28, 1908, and October 26, 1909, truly, carefully, and accurately to report and keep the plaintiff informed as to the condition of the boilers, and report to and advise it of any and all defects or conditions which might cause them to be dangerous or unsafe for the use to which they were applied; that on and prior to September 4, 1909, dangerous defects and conditions existed in the boilers rendering them unsafe and dangerous for such use, which defects and dangerous conditions were so obvious to any one having special knowledge, skill, and experience that the defendant ought, in the exercise of ordinary care, prudence, and skill, to have discovered them prior to October 25, 1909; that on and between September 4 and October

9, 1909, the defendant, pursuant to its agreement, examined and inspected each and all of the six boilers, and reported to the plaintiff that each and all were free from any and all dangerous defects, and were in good condition, and failed and neglected to inform the plaintiff of the dangerous and defective conditions above mentioned; that the defendant was careless, reckless, and negligent in making inspections, in that, among other things, it failed and neglected to discover and observe the dangerous defects referred to, and failed and neglected to make reasonable and careful and thorough examinations of the drums of the boilers; that it made merely hasty, imperfect, and superficial examinations thereof; that it wrongfully and negligently failed to inform the plaintiff of the true condition of the boilers on and prior to October 25, 1909, and wrongfully and negligently informed and advised the plaintiff that the same were safe, in good condition, and free from dangerous defects. It further avers that the plaintiff, relying upon such undertakings of the defendant, continued to use the boilers in ignorance of their true condition, by reason whereof on October 25, 1909, three of them burst and exploded. The averments as to damages do not require mention.

For the second cause of action, the complaint alleges the making and entering into the contract of insurance on July 28, 1908, under its policy of insurance numbered 57996, as described therein, and that the defendant thereby agreed to pay the plaintiff any loss which might be occasioned to said property by any bursting, explosion, or rupture of the said boilers, or either of them, not to exceed the sum of $150,000 for and during the term mentioned therein. It further avers that on October 25, 1909, during the term thereof, three of the water tube steam boilers thereby insured "burst by three separate and distinct explosions, by the force of which explosions the said boilers and the buildings adjacent thereto, belonging to this plaintiff, were destroyed." The damages are described alike with the first cause of action, and the complaint concludes with a prayer for recovery of such damages.

The defendant interposed demurrer, alleging as ground thereof that several causes of action were improperly united, and the demurrer was overruled, under an opinion filed, stating that "each cause of action arises out of a separate contract and the two contracts arose from a single negotiation or transaction between" the parties, and that they were thus properly united under the Wisconsin practice. Answers were thereupon filed, raising the various issues of law and fact submitted at the trial; and the defendant further served an offer (pursuant to sec. 2789, Wis. R. S.) "to allow judgment to be taken against it" for $50,000 with interest (as specified) and costs. The insurance policy, in so far as material, reads as follows:

"No. 65978.                                                    $150,000.00.

"The Hartford Steam Boiler Inspection and Insurance Company in consideration of the receipt of surrender of policy #57996 and three hundred and seventy-five and 25/100 dollars hereby insures Pabst Brewing Company and its legal representatives one hundred and fifty thousand dollars against all

---

(Rider.)

$150,000.00 on the six (6) Munoz W. T. steam boilers contained in the premises occupied by assured, as brewery, "New House," situate Milwaukee, Milwaukee Co., Wis., and described in the application of the assured, No. 57995; and on the property of the assured, and the property of others for which the assured may be liable, wherever located, against loss or damage, except by fire, caused by the explosion, collapse or rupture of the said steam boiler or boilers, or any of them; also against loss or damage to the assured resulting from the loss of life or personal injury of any person or persons caused by the explosion, collapse, or rupture of said steam boiler, or boilers, or any of them, and not contingent upon a judgment of liability against the assured; but the liability of the company for loss of life or injury to any one person shall not exceed the sum of five thousand dollars.

It is further provided, that in case of loss under this policy, the loss or damage to property as described herein shall be the first claim for settlement, and that the portion of the policy then remaining shall be the only amount applicable to loss of life or injury to persons; also, that the total liability of the company for loss or damage resulting from any one explosion shall not exceed the sum of fifty thousand dollars; and in case of more than one explosion the entire liability of the company shall not exceed the sum insured by this policy, viz., $150,000.00.

(Rider xxA for Policy 99B.   Attached to and forms part of Policy No. 65978.)

Hartford Steam Boiler Inspection & Insurance Co.,
H. M. Lemon, Manager.

immediate loss or damage, except by fire, to the property specified, or result-
ing from loss of life or injury to persons caused by the explosion, collapse, or
rupture of any or all steam boilers described in the application of the assured,
except as hereinafter provided, and not exceeding in amount the sum insured—
from the 23rd day of July nineteen hundred eight at 12 o'clock, noon, unto the
23rd day of July nineteen hundred and eleven at 12 o'clock, noon; to be paid
after notice and proof of loss by the assured, according to the requirements
and in conformity to the provisions of this policy, it being expressly covenanted
and agreed, as conditions of this contract, that this company is not to be liable
for any loss or damage resulting from any explosion caused by the burning of
the building or steamer containing the boiler or boilers; nor for any loss or
damage in case the load on the safety valve approved by the company's inspec-
tor, viz.: One hundred and sixty (160) pounds per square inch on each of said
six (6) Munoz water tube boilers, shall be exceeded; and if the title or posses-
sion of said property is transferred or changed, or if this policy is assigned
without the written consent of this company endorsed thereon, this policy shall
be void; and any change in the boilers, within the control of the assured,
material to the risk, without the consent of this company, shall make void
this policy.

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

"Prevention of steam boiler explosions being one of the objects of this com-
pany, it is hereby agreed that the inspectors of this company shall at all rea-
sonable times have access to said boiler or boilers, and the machinery connect-
ed therewith, on which safety depends; and ample facilities shall be afforded
to such inspectors, whenever this company shall desire it, for a thorough exam-
ination of said boiler or boilers; and should any inspector at any time discov-
er any defect affecting the safety of said boiler or boilers or the apparatus
connected therewith, the assured shall be notified and insurance by this policy
shall thereupon, in respect to the defective boiler or boilers, become void, un-
less the use of the said boiler or boilers shall cease until the defect is thor-
oughly repaired by the assured; notice of defect and suspension of insur-
ance, also the reinstatement of insurance after repairs are made, to be in
writing, delivered or mailed to the assured to the address given in this policy;
and the company reserves the right at any time to cancel this policy, in which
case, after deducting the charges for inspection, the company will return to
the assured a pro rata part of the remaining premium for the unexpired term
of this policy. This policy may also be canceled at the request of the assured,
but only in case of the sale, lease, transfer, or destruction of the boiler or
boilers insured, or if the assured cease to use them for a period of more than
three months; in which case the company, after deducting the charges for
inspection and the customary short rates for the time the policy has been in
force, will return to the assured the remaining portion of the premium."

The general verdict of the jury reads:

"We, the jury sworn in this action, do find for the plaintiff, and assess its
damages at the sum of $104,178.75."          (Signed by the foreman.)

It is supplemented as follows:

## "Special Questions.

"(1) Do you find generally in favor of the plaintiff or defendant on the first
cause of action? Answer: In favor of the plaintiff.

"(2) Do you find that there was more than one explosion? Answer: Yes.

"(3) If you answer the last question 'Yes,' then answer this: How many ex-
plosions were there? Answer: Three.

"(4) What was the total amount of damages to plaintiff caused by the explo-
sion or explosions in question, over and above the direct damages? Answer:
$901.21."                                      (Signed by the foreman.)

Other facts in evidence and rulings upon the trial are mentioned in the
opinion.

George P. Miller, Edwin S. Mack, Arthur W. Fairchild, and J. G.
Hardgrove, all of Milwaukee, Wis. (E. Sidney Berry, of Hartford,
Conn., of counsel), for plaintiff in error.

Irving A. Fish, William C. Quarles, and Charles S. Thompson, all
of Milwaukee, Wis., for defendant in error.

Before SEAMAN and KOHLSAAT, Circuit Judges, and LANDIS, District Judge.

SEAMAN, Circuit Judge (after stating the facts as above). The interesting questions presented under this writ of error arise in the suit brought by the plaintiff below, Pabst Brewing Company (hereinafter referred to as the Brewing Company), to recover damages caused by explosion of three steam boilers, forming part of a six-boiler battery in its extensive brewery plant at Milwaukee. Recovery is sought therein and verdict and judgment obtained against the plaintiff in error, Hartford Steam Boiler Inspection & Insurance Company (hereinafter referred to as the Insurance Company), under a complaint averring two causes of action—one stated in tort, for negligence in its inspection of the boilers, and the other in contract, under its policy of insurance against loss caused by explosion of the boilers. The amount of actual damages thus caused is stipulated at $97,500, and the entire amount thereof was assessed by the verdict against the Insurance Company, together with interest, making $104,178.75. It is unquestionable under the contract (and conceded as well) that such loss is recoverable against the Insurance Company, as insurer, to the extent of $50,000, and all controversy between the parties arises out of the claim and award of damages beyond that sum, named in the insurance policy as the limit of liability for loss "resulting from any one explosion." The issues of law and fact thereupon are clearly raised by the pleadings and well presented in the arguments of counsel; and, whatever may be the difficulty of solution as to the law applicable to either charge of liability, the facts are free from material conflict in the testimony upon two of the leading issues in controversy, namely: (a) The facts of periodical inspections of the boilers and reports of their condition on the part of the Insurance Company, relied upon for the assumption of duty charged in the first cause of action; and (b) the immediate circumstances of the explosion, relied upon as proving more than one explosion within the above-mentioned contract terms.

[1] For definition of the two alleged causes of action joined in the plaintiff's complaint, it is not needful to state the extended averments in the charge of tort beyond the following outline: They aver inspection of steam boilers as part of the business carried on by the Insurance Company; that its representations of skill therein, to be exercised in periodic inspections of the boilers for the information and benefit of the insured, were made to and relied upon by the plaintiff as an inducement to enter into the insurance contract referred to; that the defendant entered upon such undertaking and made inspections and reports thereof continuously, which were exclusively relied upon by the plaintiff, as defendant well knew, for prompt information of discoverable defects endangering the safety of the boilers; that prior to the last inspection by the defendant the several boilers became unsafe for further service, through cracks and defects which were readily discoverable on reasonably careful inspection; that defendant was careless and negligent in the performance of the duty

to inspect and report the condition of the boilers, and failed to inform the plaintiff of such discoverable defects; that the plaintiff, relying upon the skill and undertaking of the defendant in the premises, continued the boilers in service, in ignorance of such defects; and that three of the boilers exploded by reason thereof and caused the damage in suit. For the second cause of action, the contract of insurance on the six steam boilers is set up, insuring for $150,000 for a term of three years, and expressly providing that the liability "for loss or damage resulting from any one explosion shall not exceed the sum of fifty thousand dollars." It is then averred that three of the boilers mentioned "burst by three separate and distinct explosions," and caused the damage specified. Thus the cause ex delicto is plainly averred to arise out of the "transactions connected with the same subject of action" as the insurance contract, for which joinder appears to be authorized by section 2647, Wis. Stat. 1898, as comprehensively interpreted in Emerson v. Nash, 124 Wis. 369, 389, 102 N. W. 921, 70 L. R. A. 326, 109 Am. St. Rep. 944; and we believe error is not well assigned for the ruling of the trial court against the defendant's demurrer alleging misjoinder. Whether the testimony brought the case within the statutory meaning for joinder and submission of both issues to the jury presents a question not free from difficulty, under the defendant's several motions to require an election between the two alleged causes, but we are not satisfied that submission of both was open to denial, under the Wisconsin rule governing the right of joinder, however such course may have tended to confuse the issues. Moreover, the interpretation we adopt of insurance liability will obviate such confusion in the event of another trial.

The insured battery of boilers, described as 6 Munoz water tube boilers, were recently installed by the Brewing Company (under contract with Platt Iron Works) as a new boiler plant in a new boiler house, to take the place of 33 boilers variously located throughout the brewing plant. These Munoz boilers were not of the ordinary type. Each was composed of two horizontal steam drums above and two water drums, called "mud drums," below, with 32 vertical 4-inch tubes, extending downward from the bottom of the steam drum (about 14 feet) to the mud drum for connection between them. Horizontal steam tubes connected the two steam drums, and a bank of numerous tubes was suspended between the two rows of vertical tubes, connected at the rear of the mud drum. Outside the vertical tubing was a covering of asbestos or fire brick, extending up to cover a portion of the steam drum, called a "jacket"; and the boilers were inclosed at the front and back and across the top between the steam drums. The steam drums were 3 feet in diameter and 20 feet long, made of ⅜-inch sheet steel. As 32 4-inch openings were required at the bottom of each to receive the upright tubes, a re-enforcement strip of ⅝-inch steel, 9 inches wide, was riveted along the line to be punched to compensate for the weakness caused by such openings—a special feature of the construction which becomes prominent in the controversy over the charge of negligent inspection. The boilers were of

200 horse power each, placed in a row and connected by means of a 16-inch overhead pipe, called a "header," through which steam passed for distribution as required; and in this header was placed a "non-return valve" to prevent return of steam to the boilers. The building inclosing this battery was of brick, measuring 50 by 150 feet, and centrally located in the great brewing plant, and the boilers are referred to in the testimony as Nos. 1, 2, 3, 4, 5, and 6; Nos. 5 and 6 being separated from the others by the base of a large stack, 18 feet square.

In 1907 this boiler plant was completed, and a boiler insurance policy theretofore issued by the defendant Insurance Company was then outstanding on the pre-existing boilers, which was temporarily made applicable to the new plant; and on July 28, 1908, the policy in suit was entered into between the parties. On October 25, 1909, shortly after 4 a. m., three of the boilers, Nos. 1, 2, and 3, exploded, wrecking the boiler building, moving "a large elevator building immediately adjacent * * * bodily four feet off its foundation," and hurling wreckage over the premises and streets. Two engineers or firemen were in the boiler room, and one was killed, but the other was behind the above-mentioned stack, and fortuitously escaped alive in the midst of wreckage. According to the testimony of this survivor, boilers 1, 2, 3, and 4 were under full steam and connected up with the header, No. 5 was also under steam, and No. 6 was in course of firing to be connected up. No. 4 was crushed, but Nos. 5 and 6 were protected by the stack in some measure, and remained in place. The cause of explosion is unexplained, beyond the fact in evidence that the wreckage of the six steam drums of boilers 1, 2, and 3 shows the shells to be ruptured, respectively, along the line of rivets in the above-mentioned re-enforcement strips. Other circumstances bearing on particular questions discussed will be mentioned in reference thereto.

[2] 1. The complaint arranges the charge under the insurance policy as the second cause of action, but we believe it may best be treated as the primary ground of liability, to be considered before taking up the claim in tort. It is unquestionable that the judgment can be upheld, irrespective of other assignments of error, if the plaintiff's contention is tenable that the evidence and finding of the jury establishes more than one explosion, as the proximate cause of the loss, within the meaning of the contract limitation, which reads:

"That the total liability of the company for loss or damage resulting from any one explosion shall not exceed the sum of fifty thousand dollars; and in case of more than one explosion, the entire liability of the company shall not exceed the sum insured by this policy, viz. $150,000."

The issue of contract liability, therefore, involves alone interpretation of this provision in the light of the facts in evidence and a special finding of the jury that there were three explosions. Three boilers of the battery were exploded, and the occurrence is described by the witnesses as several explosions, detonations or reports (some naming three and others four), in distinct but rapid succession, with the first report mentioned by the chief witnesses as much heavier than those which followed. It does not appear how the pressure of steam

was increased (if it was increased at the instant) beyond the tensile strength of the boiler which was exploded at the start. The special finding of the jury referred to is consistent with this testimony, and can have no broader scope for the purpose of the present inquiry, so it must be accepted as settled that the three boilers exploded in distinct succession, and not concurrently. Indeed, we do not understand. either from common knowledge of steam pressure as an explosive force, or from the expert testimony in the record, that it could otherwise reasonably be assumed in reference to an explosion of three individual boilers so operating in a battery that any probable cause or causes would concur to explode them simultaneously in the strict sense of that term. Upon the premise of facts, however, that the explosion of one boiler was followed in rapid succession by the other two explosions, we believe the conclusion to be inevitable that one was primary and the others secondary or incidental occurrences.

Is this not one explosion, as the cause of loss, within the terms and purpose of the insurance contract? The policy reads for insurance of $150,000 for a term of three years, "on the six (6) Munoz W. T. steam boilers contained in the premises occupied by assured, as brewery 'New House' * * * and on the property of the assured, and the property of others for which the assured may be liable, wherever located, against loss or damage, except by fire caused by the explosion, collapse or rupture of the said steam boiler or boilers, or any of them; also against loss or damage to the assured resulting from the loss of life or personal injury of any person or persons caused by the explosion," not exceeding $5,000 "for loss of life or injury of any one person"—with the total liability, for loss "resulting from any one explosion," limited to $50,000 as above stated. Thus explosion is the danger insured against—steam generated in a boiler being the explosive force in contemplation—and the liability is absolute for all damage caused thereby up to the limit stated, however the explosion may originate, except "in case the load on the safety valve approved by the company's inspector * * * shall be exceeded." It is neither contingent on the actual efficiency of the boilers for their purpose, nor does any covenant enter into the contract, on either part, that the boilers are in safe condition, although it does provide for their inspection by and at the option of the insurer, and that on discovery of defects affecting the safety of the boilers and notice thereof to the assured the insurance becomes void unless use thereof "shall cease until the defect is thoroughly repaired by the assured." The six boilers mentioned in the policy were not separable entities for the purpose of insurance, but were in the well-known battery form, coupled to a common header, for joinder of several or all in steam service.

The contention in support of liability for the total loss is this, in substance: That the above-mentioned limitation for loss "resulting from any one explosion" must be construed as "made with respect to the boilers as individuals"; that it "meant to the minds of these contracting parties that, if one boiler burst, the indemnity * * * was to be limited to $50,000," and that, "when more than one boiler burst, the indemnity" was limited only to the face amount of insur-

ance, $150,000. For such interpretation of the terms, a definition contained in one of the printed provisions of the policy is greatly relied upon, reading as follows:

"That by the terms 'explosion, collapse or rupture,' as used in this policy, is to be understood a sudden substantial tearing asunder of the boiler or any portion thereof, or the sudden crushing or forcing inward of the furnace or the flues or other parts of the boiler, caused by the pressure of steam; and 'boiler' is understood to include also the steam pipe, feed pipe and blow-off pipe up to and including the stop valve nearest the boiler in each of the same, the pipes of the water column, steam and water gauges, and the safety valve."

It is argued thereupon that the term "explosion" thus used and applied only to "a boiler as an individual" thing—not using "the plural number"—amounts to a definition of like restriction of the term as used in the limitation clause. We do not understand, however, that the definition cited tends in any degree to aid the contention that an explosion of one boiler which involves as well the explosion of others does not come within the meaning of this limitation of damages resulting from an explosion. It appears as one of the general provisions of the standard form of policy, and its obvious purpose is, as we believe, to prevent restricted application of the terms referred to, and so extend the meaning as to include all attachments of the boiler which were subject to pressure. Thus explosion of any of the numerous tubes and connections of the boiler in controversy is brought within the intendment of liability, including, as of course, resulting explosions and damages. Throughout the policy the term "explosion" is used in the singular form, and we believe the limitation of liability for loss "resulting from any one explosion" accurately and entirely names the cause or event insured against, both within the settled rule of efficient or proximate cause and in accord with common usage in reference to an occurrence which involves the explosion of more than one boiler. Whatever the extent of damages resulting from an explosion, the indemnity recoverable under the contract is alike, whether one or several of the boilers explode, either concurrently or in succession, and no mention of successive (incidental) explosions is needful or desirable in the limitation clause.

The fact being established that the primary explosion in question occurred in one boiler, followed by explosion of two others plainly attributable to the first, we are satisfied that the above-mentioned doctrine of proximate cause becomes applicable to fix the one explosion as the cause of contract liability, and therefore strictly within the terms of the limitation.

[3] Various refinements which appear in the authorities in definitions of proximate cause do not require consideration for this inquiry, as the rule we refer to is well recognized as elementary and of undoubted force for definition of insurance liability, namely: When concurring causes of the damage appear, the proximate cause to which the loss is to be attributed is the dominant, the efficient one, that sets the other causes in operation, and causes which are incidental are not proximate, though they may be nearer in time and place to the loss. Insurance Co. v. Tweed, 7 Wall. 44, 19 L. Ed. 65; Insurance Co. v.

Transportation Co., 12 Wall. 194, 20 L. Ed. 378; Insurance Co. v. Boon, 95 U. S. 117, 130, 24 L. Ed. 395; The G. R. Booth, 171 U. S. 450, 19 Sup. Ct. 9, 43 L. Ed. 234. This rule is both well founded and of special force in reference to a battery of boilers, whereof the amount of damage cannot be distinguished between the contributing causes. Vide Insurance Co. v. Transportation Co., supra; The G. R. Booth, supra. Although the jury were advised by the trial court, in accord with such rule, that if the several explosions were "in the chain of causation, as it is called, from the first break," it would constitute one explosion, they were also instructed, in substance, that the explosions would be separable, if it appeared that the effect of the first explosion would not have exploded the others without intervention of another cause, the alleged defective condition of the second and third boilers; and it was thereupon submitted to the jury to determine for both issues (contract and tort) whether there was one explosion or several. As the condition of the boilers referred to relates only to their strength to resist the strain produced by the first explosion, in no wise relieving the insurer from liability, we do not understand that it affects the question of proximate cause. However it may have contributed to the damage, it was not an "intermediate cause, disconnected from the primary fault [cause] and self-operating, which produced the injury." Mil. & St. Paul Ry. Co. v. Kellogg, 94 U. S. 469, 24 L. Ed. 256. We believe the above-mentioned instruction was erroneous, and that the contention of like import in the argument on behalf of the defendant in error must be overruled. The question of proximate cause became one of law under the settled facts, and was not open for submission to the jury.

[4] Furthermore, if the meaning of the term "explosion" as used in the policy were not thus settled, the proof tendered of common usage in the singular form, as applicable to explosion of several boilers in immediate succession, was clearly admissible by way of ascertaining the sense in which the term must have been understood between the parties. This evidence embraced numerous reports in scientific and technical journals (American and English), official reports of disasters, and local publications—all showing like usage of the term "explosion" where multiple boilers were exploded—and its rejection was erroneous under the view adopted by the trial court for its interpretation.

[5] In the light of the above-mentioned rule of proximate cause and of the well-known purpose of insurance for a term of years against losses caused by fire or other specified disaster, we are impressed with no doubt that the provision in controversy was intended and must be interpreted to limit liability to $50,000 for a single disaster arising during the three years. This meaning conforms to the requirement of the Wisconsin statute, in force when the policy was issued, which provides that no corporation doing business in the state "issuing a policy of boiler insurance shall expose itself to any loss under any one accident to an amount exceeding fifty thousand dollars" —Wis. R. S. 1898, § 1966–41—through which it may well be presumed that the assured so understood the purpose. Moreover, the Insurance Company informed the assured thereof, in its written proposal, stat-

ing the rates of insurance for $150,000 and for $100,000, "with a $50,000 limit for any one loss in both cases," which was accepted by the assured with direction to write the policy in suit. Both letters were introduced in evidence on behalf of the defendant, but were ultimately excluded by the trial court; and we believe error was well assigned for their rejection.

Under the foregoing view, the defendant was entitled to direction of a verdict for $50,000 and interest, as requested, on the contract cause of action, and the judgment must be reversed, unless the other cause of action furnishes ample ground for its support on the present record.

2. The propositions of law on which the alleged cause of action in tort rests are far wider in signficance, if not more difficult of solution, than those raised under the insurance contract, and their settlement as tenable merely establishes the relation between the parties under which the issues of fact may arise which are of chief importance to the parties in the present controversy. These issues of fact are: (a) Of negligence on the part of the Insurance Company in inspection of the boilers, relied upon by the Brewing Company in their use and resulting in their explosion; (b) of contributory negligence therein on the part of the Brewing Company; and various assignments of error are involved under each in reference to rulings upon the evidence and instructions given or refused, for later consideration.

In the insurance contract provision is made for right of inspection on the part of the Insurance Company at its option, and for its own protection and benefit; but it is conceded that no contract obligation is thereby created to inspect for the benefit of the assured, nor to advise the assured from time to time as to the condition of the boilers. The law casts upon the owner of the boilers when in use, as instrumentalities of danger, the duty to inspect and care for their safety, for protection of the public; and, of course, the owner may delegate the inspection and care to competent employés or other agency (or both) remaining answerable for their negligent performance. As foundation for the present charge of liability, however, it is contended that the duty of inspection was assumed by the Insurance Company, as an undertaking outside the insurance contract and its purposes, to relieve the Brewing Company of performance thereof, and all inspections were so made and relied upon for safety in use of the boiler up to the time of the explosion. Thus the question arises: Can liability be so predicated, at the side of the insurance contract, and without other consideration, for alleged negligent inspection?

[6] Laying aside for the moment the objections raised to the evidence, as tending to vary the written contract which was made and into which previous understandings must be treated as merged, the undisputed facts (received in evidence over the objections) may be briefly summarized: The Brewing Company had long held explosion insurance policies, written by the Insurance Company, which had always been attended by periodical inspection by the insurer, with reports made in each instance to the assured as to conditions found; and the inspector representing the Insurance Company inspected the new battery of boilers in the course of installation, preparatory to

their insurance. After the policy in suit was issued, the boilers were continuously inspected and reported upon by the Insurance Company; the last inspection being made in the month previous to the explosion. Advertisements of the Insurance Company accompanied its above-mentioned reports to the assured, calling attention to the benefits which were given with the insurance, through its competent experts engaged in the inspections, as a means "for immunity from an explosion," a service "superior even to providing indemnity for a loss," and stating that about one-half of the premium received was expended for such inspections, making their insurance desirable "to provide for regular and thorough inspection" and maintain "safe operating condition." The numerous reports of its inspections made by the Insurance Company during the term of the instant policy, mention, various matters for attention, but report no cracks or other unsafe conditions. Testimony was also received of oral representations made by a solicitor in negotiations for earlier insurance, but it is not included in the recital, as we believe special objection raised thereto for want of proof of agency should have been sustained, even if it were otherwise admissible.

We are of opinion that these facts of continuous conduct on the part of the Insurance Company in reference to the inspections and their purpose—if relied upon by the Brewing Company and so understood by the Insurance Company, as alleged—are of probative force to show both the undertaking of duty and relation of the parties upon which the action for negligence in performance thereof may be predicated. Neither the evidence nor the duty affects the terms, purpose, or performance of the insurance contract, or liability thereunder; and the assumed duty arising ab extra such contract, the objection above referred to, for inconsistency therewith, was rightly overruled. Inspection of the boilers necessarily requires care and skill in its performance for safety in their use, and, when thus undertaken by the Insurance Company to serve as a benefit to the assured, the duty arises, with or without contract obligation to inspect, to exercise reasonable care and skill in each inspection so made, although no such rule of duty obtains in favor of the assured where the inspections are attributable alone to the policy provision for the sole benefit of the insurer, which would leave no ground for a finding of fact that they were understood between the parties to be made and accepted as inspection service for direct benefit to the Brewing Company. But, if so made and accepted as beneficial service, we understand the above-mentioned rule to be applicable as well with or without contract obligation for the service; that it is such making of the inspections, and not obligation on the part of the Insurance Company to make them, upon which the duty of care arises. In this view, we are not impressed with force in the contention on behalf of the Brewing Company that the service was in no sense contractual, nor the contentions on the part of the Insurance Company that the duty, as averred, "was imposed by contract" and ineffectual within the rule, either as purely voluntary, or as a mandatum, within Wharton's definition (Wharton on Neg. § 482), as a "consensual contract in which one party commissions another to undertake a particular business for him,

which commission the party so invited agrees to undertake." The service and duty are not derived from the insurance contract, and it is not essential to define their origin as contractual or otherwise.

This doctrine of duty incurred and of liability for injurious negligence in its performance is of common-law origin, as a rule of public policy not dependent upon contract obligation for the performance, and well supported, as we believe, by the general trend of authorities. For its scope and pertinent examples of its application in various phases of the inquiry, we are content to refer to leading citations from the mass of cases called to our attention and examined for their bearings upon the issue.

The English authorities most frequently cited for the rule are Coggs v. Barnard, 2 Lord Raymond's Rep. 909 (2 Annæ Reginæ B. R. 1703); Heaven v. Pander, 11 Queen's Bench Div. 503; George v. Skivington, 5 Law Rep. Exch. 3; Boorman v. Brown, 3 Queen's Bench, 843, 850, affirmed House of Lords, 11 Clark & F. 1. The early case of Coggs v. Barnard is of first importance, as the opinion is by a great expositor of the common law, Lord Chief Justice Holt, in reference to gratuitous service extremely petty in character. The opinion thus states the matter in controversy:

"The case is shortly this: The defendant undertakes to remove goods from one cellar to another, and there lay them down safely, and he managed them so negligently that for want of care in him some of the goods were spoiled. Upon not guilty pleaded, there has been a verdict for the plaintiff, and that upon full evidence, the cause being tried before me at Guild Hall, there has been a motion in arrest of judgment that the declaration is insufficient, because the defendant is neither laid down to be a common porter, nor that he is to have any reward for his labor, so that the defendant is not chargeable by his trade, and a private person cannot be charged in an action without a reward."

These objections are overruled upon consideration of the various sorts of bailments, in which the sixth sort is defined as arising "when there is a delivery of goods or chattels to somebody who is to carry them or do something about them gratis, without any reward for such his work or carriage, which is the present case." On reference to various authorities, the opinion states that this undertaking obliges the undertaker to a diligent management, and it then proceeds to answer the contention that for want of consideration the undertaking is but nudum pactum, as follows:

"That the owners trusted him with the goods is a sufficient consideration to oblige him to a careful management. Indeed, if the agreement had been executory to carry these brandies from one place to the other such a day, the defendant had not been bound to carry them, but this is a different case, for assumpsit does not only signify a future agreement, but in such a case as this he signifies an actual entry of the thing and taking the trust upon himself, and, if a man will do that and miscarries in the performance of his trust, an action will lie against him for that, though nobody could have compelled him to do the thing."

Heaven v. Pander appears to be most frequently cited for the rule of duty, as stated by Brett, Master of the Rolls (afterwards Lord Esher), in the leading opinion, although the report shows that his associates (Cotton, L. J., and Bowen, L. J.) concurred only in the

decision upon other grounds. The defendant was owner of a dry dock used for painting and repairing vessels, and as an incident to such use supplied and put up the necessary staging for the work, but, when delivered over to the shipowner, the staging was no longer under control of the defendant. The plaintiff was a painter, in the employ of a contractor with the shipowner, engaged in painting the vessel in the dry dock; and during the work of painting, while the plaintiff was using the staging, one of the ropes supplied by the defendant for its support gave way, causing the plaintiff's fall and injury. Evidence appeared tending to show that the rope was scorched and unfit for support of the staging, and that reasonable care was not exercised by the defendant as to its "state and condition at the time." The plaintiff recovered in the trial court, but the judgment was reversed on appeal to the Queen's Bench Division; and on appeal therefrom the case was decided in favor of the plaintiff by the Master of the Rolls and law judges above mentioned. In the opinion handed down by the Master of the Rolls, after discussion of the case from various standpoints, both as to facts and law, the following doctrine was pronounced as applicable thereto, under authorities cited:

"The proposition which these recognized cases suggests, and which is therefore to be deduced from them, is that whenever one person is by circumstances placed in such a position with regard to another that every one of ordinary sense who did think would at once recognize that, if he did not use ordinary care and skill in his conduct with regard to these circumstances, he would cause danger or injury to the person or property of the other, a duty arises to use ordinary care and skill and avoid such danger."

The opinion is supplemented, however, by the opinion of Cotton, L. J., speaking for himself and for Bowen, L. J., in effect, that all who were engaged in the painting "were there for business in which the dock owner was interested," and "must be considered as invited by the dock owner to use the dock and all appliances" provided by him, so that in favor of all such persons he "was under obligation to take reasonable care that at the time the appliances * * * were in a fit state to be used"; that this decides the appeal in favor of the plaintiff, "and I am unwilling to concur with the Master of the Rolls in laying down unnecessarily the larger principle which he entertains, inasmuch as there are many cases in which the principle was impliedly negatived" (citing cases). The above-quoted broad statement of the rule, although entitled to consideration as the deliberate expression of a great jurist, cannot have the force of a precedent therefor. Nor is its adoption needful for any requirement of the instant case, but it remains of interest for the favorable notice received in numerous American authorities.

In George v. Skivington, the opinion is by Kelly, C. B., Barons Piggott and Cleasby concurring. The facts are thus stated:

"The plaintiff purchased a chemical compound as a hair wash for the use of his wife, which was made up of ingredients known only to the defendant, and by him represented to be fit and proper to be used for washing the hair, with an express statement that the defendant knew the purpose for which the article was bought. The declaration further alleges that the defendant so unskillfully and negligently and improperly conducted himself in and about

selling and making the said compound as to cause the damage complained of to the wife, and the question is whether an action will lie at the suit of the plaintiff Emma George, her husband being joined for conformity."

The opinion states that it is unnecessary to enter into the question whether there was a warranty, express or implied, towards the purchaser, "because the contract of sale is only alleged by way of inducement, the cause of action being not upon that contract, but for an injury caused to the wife of the purchaser by reason of an article being sold to him for the use of his wife, and so sold to the defendant's knowledge, turning out to be unfit for the purpose for which it was bought." It rules thereupon that there was "a duty on the defendant, the vendor, to use ordinary care in compounding this 'wash for the hair' "; that there was unquestionably such duty toward the purchaser, and "it extends, in my judgment, to the person for whose use the vendor knew the compound was purchased." Cleasby, B., remarks:

"I think there was a duty imposed upon him to use due and ordinary care, and of the breach of that duty I am of opinion the female plaintiff, who was injured, can take advantage. The two things concur here, negligence and injury flowing therefrom."

The case of Boorman v. Brown is a leading citation and instructive for the exposition of the duty arising in various forms, either under contract or as a general duty implied by law, with cause of action founded thereon, whether for nonfeasance or misfeasance—discussed chiefly in the Court of Errors, opinion by Tindall, C. J., but further discussed by Lords Campbell, Brougham, and Cottonham on writ of error to the House of Lords. It was a suit in tort against a broker for alleged neglect of duty in parting with goods of his client without securing payment, and recovery of damages was affirmed. Quotations from the opinions—all founding the duty on contract—are not deemed needful.

In reference to professional services (of physicians and surgeons, attorneys, chemists and the like), requiring skill in their performance, the common-law rule of duty to exercise skill and care in the performance is uniformly recognized in favor of the party served, whether contractual or voluntary (chapter 34, Bishop on Noncontract Law; Savings Bank v. Ward, 100 U. S. 195, 25 L. Ed. 621); and we believe it to be applicable alike to the undertaking for inspection services alleged in the case at bar.

The early lines of American authorities exemplifying and enforcing the rule of duty implied by law are too numerous for any attempt to review them within reasonable limits for this opinion, and reference is therefore made to a few of the more recent cases which impress us to be apt and well considered.

In Van Winkle v. American Steam Boiler Co., 52 N. J. Law, 240, 19 Atl. 472, the unanimous opinion of the Supreme Court by Chief Justice Beasley meets the principal objections urged in opposition to the charge of duty in the instant case upon demurrer to averments of fact which are singularly pertinent. The suit was for recovery against the defendant Insurance Company of damages to adjacent property

caused by explosion of a steam boiler, alleged to be due to negligent inspection of the boiler by such insurer thereof, the plaintiff being owner of the property so damaged, but no party to the alleged undertaking of the insurer with the owner of the boiler to inspect and report its condition.  Thus the averments of the declaration necessarily involved the question of duty arising thereunder between the owner of the boiler and the Insurance Company, together with the further question whether the alleged duty was operative in favor of the plaintiff.  The deductions stated in the opinion may be summarized as follows:

The policy of insurance written by the defendant in favor of the Ivanhoe Paper Company (owner of the plant containing the boiler) against explosion damages (which was similar in terms to the policy in evidence here) provided only for "the right to make inspection if it pleased so to do," and, if the insurer had refrained from making inspection, "it would have incurred no responsibility, either to the assured or to the plaintiff."  But it did make "repeated inspections of the boiler in question," and furnished certificates thereof for guidance of the assured; and by such course of action "a duty in favor of the assured was imposed on the defendant, by operation of the contract itself, to act with ordinary skill and care, both with respect to its inspection and its certificate," thus becoming "answerable to the assured" for damages "occasioned by the absence of such care and skill."  As the boiler "was a dangerous thing" if not properly handled, it was the duty of the owner to have it properly inspected, and for neglect of such duty he could be held liable for resultant damages to a neighbor's property through explosion of the boiler.  When the Insurance Company entered upon the performance of that duty, it became the substitute for the owner therein, and incurred the abovementioned responsibility, which "belonged not to the ownership of the machine, but to the function of operating it," with the duty to exercise care and skill arising in favor of the owner "by virtue of its contract" and in favor of the plaintiff "by virtue of the law."  The liability of the Insurance Company may be defined as well upon the broader ground that when "any person undertakes the performance of an act which, if not done with care and skill, will be highly dangerous to the persons or lives" of others "the law, ipso facto, imposes as a public duty the obligation to exercise such care and skill," and for nonperformance of such duty resulting in damage to the person or property of another as its obvious product an action will lie.

The common-law rule of duty voluntarily assumed, outside the contract obligations between the parties, and the liability for want of reasonable care and skill in its performance, has frequently arisen and been applied to authorize recovery by a tenant against his landlord for damages caused by negligence of the landlord in making repairs to the leased premises, although the lease imposed no requirement to make them; the cause of action resting "upon the tort feasance of the landlord in undertaking to make repairs and in doing the work negligently."  Gill v. Middleton, 105 Mass. 477, 7 Am. Rep. 548; Gregor v. Cady, 82 Me. 131, 19 Atl. 108, 17 Am. St. Rep. 466; Wertheimer

v. Saunders, 95 Wis. 573, 70 N. W. 824, 37 L. R. A. 146; La Brasca v. Hinchman, 81 N. J. Law, 367, 79 Atl. 885.

For other references in various pertinent applications of the rule and discussion thereof, we cite Bishop v. Weber, 139 Mass. 411, 1 N. E. 154, 52 Am. Rep. 715; Torgesen v. Schultz, 192 N. Y. 156, 84 N. E. 956, 18 L. R. A. (N. S.) 726, 127 Am. St. Rep. 894; Flint & Walling Mfg. Co. v. Beckett, 167 Ind. 491, 79 N. E. 503, 12 L. R. A. (N. S.) 924; Boston Woven Hose & Rubber Co. v. Kendall, 178 Mass. 232, 59 N. E. 657, 51 L. R. A. 781, 86 Am. St. Rep. 478.

In conformity with the foregoing view of the doctrine of duty applicable to this case, the various assignments of error directed to that branch of the issue must be overruled, and we come to the issues of fact upon the merits of the controversy—the charge of negligence on the part of the defendant, and counter charge of plaintiff's contributory negligence—under various complaints of error as to evidence received and instructions given and refused. The questions of reliance upon and inspections and mutual understanding in respect thereof are alike issues of fact, but do not require special discussion.

[7] *Issue as to negligence of defendant.* These premises are unquestionable for the issue of negligence under which the several assignments arise to be first considered: The burden rests on the plaintiff to prove want of care and skill in the defendant's inspections of the boilers as cause of the explosion; and the fact of the explosion, which occurred more than a month after the last inspection and when the plaintiff was in the exclusive operation of the boilers, cannot serve to relieve the plaintiff in any measure of such burden of proof. The presumption of fact remains, in the nature of evidence, that the inspections on the part of the defendant were conducted with reasonable care and skill. In no degree is the defendant answerable for defective construction or material—if defects there were in respect of the so-called "re-enforcement strips" or otherwise—unless it is proven that cracks or other defects endangering use of the boilers had developed in one or more of the three boilers which were exploded at the time of their inspection, and were then discoverable upon reasonably careful inspection of the boiler. So, without proof that the alleged cracks in the shell of such boilers were thus discoverable when either of the inspections occurred, the charge of liability must fail.

In this undoubted aspect of the issue, no direct proof appears in the record, either that ruptures of any boiler were then discoverable, or that ruptures existed therein at or prior to their last inspection by the defendant, and the finding of liability rests on circumstances offered and received as tending to prove such preëxisting condition of the exploded boilers. The force of such evidence, when probative circumstances appear, is well recognized, and from its nature special care is required, both to exclude facts not entitled to consideration, from which unjust inferences may be adopted, and to instruct the jury upon their bearing. We are of opinion therefore that prejudicial error is well assigned in this vital branch of the case in the following particulars:

(1) Testimony was received from several witnesses describing cracks in the unexploded boilers, Nos. 5 and 6, upon the examination after the explosion, when the wreckage was cleared away from them; and later portions cut out of the boilers showing these cracks as penetrating the shell along the line of the re-enforcement strips were introduced in evidence. The trial court instructed the jury in reference thereto that "it is no proof because you find cracks in one boiler that there are cracks in another boiler," but that the "evidence was put in merely for the purpose of putting the defendant's inspector upon inquiry, upon notice that, if he found cracks in one boiler, he would be liable, perhaps, to find them in some other boiler, and to thus increase his vigilance." We believe this proof to be inadmissible for any legitimate purpose. Neither the engineer nor other employés of the plaintiff engaged constantly in work about and within the boilers, nor any witness, testifies that such cracks had developed before the explosion; and the assumption is unauthorized, without proof, that the force of the explosion, which moved an adjacent elevator building "bodily four feet off its foundations," or other causes described by witnesses, would not injure these boilers. Furthermore, testimony appears tending to prove, not only the probability of such injury under the conditions shown, but that it would have been impossible to use the boilers, at the usual steam pressure, with such cracks as subsequently appeared. The evidence, however, was submitted to the jury, in effect, as establishing the fact of such rupture of boilers 5 and 6 prior to the explosion, to be considered as notice to put the inspector on inquiry for like cracks in other boilers, and the several assignments of error thereupon—numbered 20, 21, 26, 32, and 65—are sustained.

(2) Experts called on behalf of the plaintiff were interrogated by its counsel upon like assumption of facts that boilers 5 and 6 were "uninjured by the explosion," and were theretofore cracked as shown in the exhibits, and their testimony so predicated may well have influenced the finding of the jury. For the reason above stated, the assignments of error in reference thereto—numbered 19, 28, 30, and 31—are sustained.

(3) Embraced in the above-mentioned questions and answers were further assumptions of fact that excessive and continuous leakage had occurred in the boilers, as specified in the question in conformity with testimony introduced. The questions directed to proving this from the existence of cracks in the boilers are unobjectionable; but assignment 31 reaches a question thus predicated to prove notice to the inspector, through such leakage, that ruptures of the boiler shell were indicated thereby. Objection is raised for two reasons: That the question ignores another cause of leakage which appears from the testimony, and that it includes persistent leaks of which the inspector was not advised. We believe the objections to be well founded under the testimony, and that the ruling thereupon must be deemed prejudicial, in view of denial of the instruction requested in reference thereto, as below mentioned.

(4) On behalf of the defendant an instruction was requested, in substance, that if the jury "find from the evidence that defendant's

inspector was not informed and did not know of the existence of persistent and recurring leaks along the re-enforcement plate of said boilers, but only knew that leaks existed at the time shown in his reports in evidence," and that the leaks which were discovered by him "were stopped by calking," or that he was so informed, and if the "inspector might, in the exercise of reasonable care and prudence under the circumstances, have considered that said leaks were caused by defective tube and rivet conditions, and not by cracks in the boiler shell, then you must find for the defendant upon the first cause of action." We believe the defendant was entitled to have the jury so instructed under the testimony, for the reason above stated; that no instruction was given of like import; and that denial thereof was erroneous, as pointed out in the forty-eighth assignment.

[8] *Issue of contributory negligence.* The question of fact was distinctly raised whether negligence appeared on the part of the plaintiff, particularly in reference to developments during the five weeks which intervened after the last inspection of boilers Nos. 1, 2, and 3. Plaintiff's employés had entire charge of the boilers and their use (aside from defendant's inspection service), and it was their practice to lay off two boilers each week for cleaning and internal inspection. Such inspection was usually made by assistant engineer Felber, and the cleaning and other work by the boiler washer Risner, both of whom gave testimony at the trial which furnishes the evidence (undisputed) referred to in two instructions, requested on behalf of the defendant and refused by the court, as follows:

"There is evidence in this case tending to show that boilers 1, 2, and 3 were leaking continuously during the week before the explosion, and particularly on the Friday before the explosion, and if you find that these leaks were of such a character that a reasonably prudent engineer in charge of said boilers ought in the exercise of ordinary care to have known that the said boilers were not in the condition in which the same were when inspected by Mr. Bowie on September 19th, September 4th, and September 11th, respectively, then you are instructed that such boilers were not being operated at the time that the explosion occurred in reliance upon any inspections thereof made by the defendant, and you must find for the defendant on the first cause of action." (Assignment 45.)

"It appears in evidence that Bowie last inspected boiler No. 1 on September 19th, boiler No. 2 on September 4th, and boiler No. 3 on September 11th, and boiler No. 4 on October 9th. It also appears that Felber made an interior inspection of two of these boilers, 1, 2, 3, and 4 on October 9th and of two on October 16th, prior to the explosion, and if you find that there were then cracks in the drums of either boilers 1, 2, or 3, and that said cracks were discoverable by the exercise of ordinary care and by a reasonably prudent man, occupying the same position occupied by Felber and engaged in the same line of business under similar circumstances, and that the cracks so found contributed to produce the explosion, then you will find for the defendant on the first cause of action." (Assignment 46.)

We are of opinion that these or equivalent instructions were needful and proper, one or both, to enable the jury to understand this important feature of the case; that the instructions which were given, in general terms (assignments 55, 56), were insufficient for such purpose under the complications presented; and that error is well assigned thereupon.

Upon the further issue of understanding between the parties that

the plaintiff relied solely on the defendant's inspection and reports for safety in use of the boilers, testimony was received from two witnesses—Mr. Pabst, president, and Mr. Clasmann, chief engineer of the Brewing Company—in effect, that it was agreed between the witnesses when Clasmann was engaged as engineer that the steam boilers of the Brewing Company were to be insured for the purpose of having inspection thereof, and that this inspection was not within the duties of such engineers. We believe the twenty-third assignment of error, based on reception thereof over the defendant's objection for want of participation in or notice of such arrangement, must be sustained. In reference to the forty-ninth assignment of error for denial of an instruction requested by the defendant—in substance, that there was evidence in the case to be considered "that plaintiff relied as to the condition of said boilers upon its engineer, Clasmann, or its consulting engineer, Chapman, or Munoz," and if the jury found therefrom "that the plaintiff relied upon them, or any of them, as the basis for its judgment as to the condition of said boilers," they were to "find for the defendant on the first cause of action"—we are not satisfied that error was committed. The evidence relating to Chapman and Munoz does not impress us to have the bearing assumed thereby, whatever may be fairly inferred from the testimony as to the position and long service of Clasmann with the plaintiff and his experience of many years in steam engineering.

The contention on behalf of the defendant that any recovery under the first cause of action is subject to the limitation of $50,000 fixed by the insurance contract, so that it must be dismissed when that sum is allowed under the contract, we believe to be untenable. It is true that the trial court instructed the jury that both causes of action were subject alike to the insurance limitation, but we do not understand the theory upon which such ruling was based. Under our opinion (above stated) of the duty and liability charged as the first cause of action, both must arise outside the insurance contract, and neither affect its provisions nor can be affected thereby. While there can be no double recovery for the same damages under either charge, recovery of insurance indemnity up to the limit of the contract satisfies the other claim to the extent only of such recovery, leaving any liability in tort applicable for damages suffered beyond the amount so recovered.

The judgment accordingly is reversed, and the cause remanded for a new trial.