(No. 37795.—

CHARLES JOSEPH NELSON *et al.,* Appellants, *vs.* UNION WIRE ROPE CORPORATION *et al.,* Appellees.

*Opinion filed March 18, 1964.*

SCHAEFER, J., HOUSE, J., and UNDERWOOD, J., dissenting.

James A. Dooley, of Chicago, for appellants.

Winston, Strawn, Smith & Patterson, and Berchem, Schwantes & Thuma, both of Chicago, (George B. Christensen, Charles J. Calderini, Donald N. Berchem, and Edward J. Wendrow, of counsel,) for appellee American Mutual Liability Ins. Co.

Kirkland, Ellis, Hodson, Chaffetz & Masters, of Chicago, (Max E. Wildman and Frederick W. Temple, of counsel,) for appellee Archer Iron Works, Inc.

Reid, Ochsenschlager, Murphy and Hupp, of Aurora, (L. M. Ochsenschlager, and Charles F. Thompson, Jr., of counsel,) for *amici curiae*.

Mr. Chief Justice Klingbiel delivered the opinion of the court:

The 18 plaintiffs in this case brought suit in the superior court of Cook County to recover for personal injuries and wrongful deaths suffered on March 19, 1957, when a temporary construction hoist, being operated in conjunction with the erection of a multi-story courthouse in the city of Jacksonville, Florida, plunged a distance of six floors with 19 workmen aboard. Seven were killed and the remainder were severely injured. Two of the plaintiffs, (we use the term to include plaintiffs' decedents,) were employees of George D. Auchter Company, the general contractor which owned and operated the hoist, while the balance were employees of Auchter's subcontractors on the project. The actions, later consolidated, were brought against Union Wire Rope Company, manufacturer of a cable that broke, Archer Iron Works, designer and manufacturer of the hoist and a safety device thereon which failed to halt the fall, and American Mutual Liability Insurance Company, the workmen's compensation and public liability carrier for Auchter, which was charged with the

negligent performance of gratuitous safety inspections and safety engineering service.

Following an extended trial, judgments were entered on jury verdicts finding the defendants Union Wire and Archer Iron not guilty, and finding defendant American Mutual guilty and liable for damages assessed in a total amount of $1,569,400. On appeal, both by plaintiffs and American Mutual, the Appellate Court for the First District affirmed the judgments in favor of Union Wire and Archer Iron, but reversed outright the judgments against American Mutual. (*Nelson* v. *Union Wire Rope Corp.*, 39 Ill. App. 2d 73.) We have allowed the plaintiffs' petition for leave to appeal to further review the matter. In addition, we have granted leave to several insurance groups to file a brief as *amici curiae.*

As a matter of initial concern it is unnecessary in our opinion to completely detail the respective pleadings, proof, arguments and authorities advanced in relation to the issues on review between plaintiffs and defendants Archer Iron and Union Wire. Although we do not necessarily adopt all that is said by the Appellate Court, particularly with respect to its concepts of various rules of evidence, and we do not approve of some aspects of Archer's presentation in this court, we are in basic accord with the court's judgments as to these two defendants and see no beneficial purpose in repetition or further analysis of those phases of the litigation. *Gould* v. *Gould*, 408 Ill. 526; *Kamienski* v. *Bluebird Air Service, Inc.* 389 Ill. 462.

The substance of plaintiffs' complaint against American Mutual, (hereafter referred to as defendant) and the theory they have consistently adhered to, is that the insurance company had gratuitously undertaken to make safety inspections of the practices and equipment of Auchter, its insured, and had carelessly and negligently performed the said inspections, as the proximate result of which plaintiffs were injured and killed. Other specifications charged that

defendant had carelessly and negligently failed to detect and report: that the hoist's safety mechanism was inadequate and defective; that the tower was improperly designed and manufactured in that it did not have sufficient strength to permit the safety device to function; that the cable was in a worn condition; that the hoist was being used for the transportation of personnel in violation of a city ordinance, and that a sheave on the hoist was of improper size in violation of a city ordinance. A concluding specification charged that defendant had negligently failed to warn Auchter against the unsafe practice of permitting personnel to ride on the hoist. In answer, defendant denied that it had undertaken, gratuitously or otherwise, to make such safety inspections, or that such safety inspections of practices, machinery or hoists had in fact occurred, and denied that it had been guilty of negligence of any kind, or in the respects specifically charged. Further, defendant denied that it had made periodic or regular surveys or inspections of the premises or equipment, and while admitting that an employee had made intermittent and infrequent surveys and inspections of the premises, it denied that they had pertained to or included the hoist, and alleged that they were for the sole purpose of keeping itself advised of the risk it had insured. As a first affirmative defense defendant alleged that, because it was the general contractor's compensation carrier, it was not subject to suit as a third party tort feasor under the Florida Workmen's Compensation Act; as a second affirmative defense it was alleged that if it had in fact performed safety inspections as plaintiffs charged, it became a subcontractor and was thus immune from tort liability to plaintiffs by virtue of the Florida act.

Under these pleadings, and the proof and arguments advanced to sustain them, we are confronted with three principal issues, to be determined under the law of Florida as the situs of the occurrence and the State whose laws

regulate the relationships of the parties. (*Mithen* v. *Jeffery,* 259 Ill. 372.) Those issues may be stated as follows: first, was a valid common-law action proved against defendant in this case; second, were plaintiffs' causes of action against defendant taken from them by the Florida Workmen's Compensation Act; and, third, did defendant, by making safety inspections, become a subcontractor on the courthouse project so as to gain immunity from tort liability under the act?

Before considering the particular facts of this case, we think it well to examine the legal foundation upon which plaintiffs' actions are based. Originating with the decision of *Coggs* v. *Bernard,* 2 Lord Raymond 909, it has come to be a recognized principle that liability can arise from the negligent performance of a voluntary undertaking. In our times a clear and oft-cited statement of the principle is the language of Justice Cardozo in *Glanzer* v. *Shepard,* 233 N.Y. 236, 135 N.E. 275, 276, when he said: "It is ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all." (See also: 38 Am. Jur., Neg. sec. 17; 5 Harvard Law Review 222.) Florida, like Illinois, has recognized the doctrine. (*Banfield* v. *Addington,* 104 Fla. 661, 140 So. 893, 896; *United States* v. *Lawter,* (5th cir.) 219 F.2d 559; *United States* v. *DeVane,* (5th cir.) 306 F.2d 182; *Triolo* v. *Frisella,* 3 Ill. App. 2d 200.) In addition, Florida has frequently stated that it will adhere to the views of the Restatement of Torts, (*Propper* v. *Kesner,* (Fla. 1958,) 104 So. 2d 1; *Tampa Drug Co.* v. *Wait,* (Fla. 1958,) 103 So. 2d 603; *Matthews* v. *Lawnlite Co.* (Fla. 1958,) 88 So. 2d 299,) where the doctrine is stated in this manner: "(1) One who gratuitously renders services to another, * * * is subject to liability for bodily harm caused to the other by his failure, while so doing, to exercise such competence and skill as he possesses." § 323(1).

Our Appellate Court, in considering the doctrine as stated in the Restatement, concluded that it was "properly applicable only in situations involving active negligence, or misfeasance," (39 Ill. App. 2d at 129,) an earlier portion of its opinion indicating that it equated the terms "active negligence" and "misfeasance" as meaning the "creation of a risk, or danger," and its belief that defendant here could not be liable for a gratuitous undertaking unless it was guilty of negligence which "caused the hoist to fall." (39 Ill. App. 2d at 122.) In this we believe the court was plainly wrong. The language that a volunteer is liable for failure to use such competence and skill as he possesses does not admit to a conclusion that the only duty of the volunteer is to refrain from positive acts of negligence. Moreover, in those cases, subsequently discussed, where insurers have incurred liability as the result of gratuitous inspections of machines and equipment, liability rested upon a breach of the duty to make the inspections with due care, not upon acts which "created" dangers or defects, or which caused the occurrence by which injury was received. (See: *Van Winkle* v. *American Steam-Boiler Ins. Co.* 52 N.J.L. 240, 19 Alt. 472; *Hartford Steam Boiler Inspection & Insurance Co.* (7th cir.), 201 Fed. 617.) As is shown by defendant's own citation of authority, *viz.*, *Viducich* v. *Greater New York Mutual Insurance Co.* 80 N.J. Super. 15, 192 A. 2d 596, plaintiffs, to support their actions, had only to show (1) that defendant undertook to make safety inspections and to render safety engineering services under circumstances which created a duty on defendant, owed to plaintiffs, to perform its undertakings with due care, and (2) that the gratuitous undertakings were negligently performed, such negligence resulting proximately in plaintiffs' deaths and injuries. See also: *McClure* v. *Hoopeston Gas and Electric Co.* 303 Ill. 89, 96; *Devaney* v. *Otis Elevator Co.* 251 Ill. 28, 33.

There is respectable authority, old and new, that gra-

tuitous inspections by insurers may be made under such circumstances as to create an enforceable duty to persons known and unknown. The latest of these is *Smith* v. *American Employers' Insurance Co.* 102 N.H. 530, 163 A. 2d 564, a decision which our Appellate Court erroneously dismissed as being based solely on a contract agreement. In that case the complaint of the plaintiff alleged that the employer's workmen's compensation carrier, for some time prior to the accident, had gratuitously conducted monthly inspections at the insured's plant, which extended to an air compressor that exploded and injured plaintiff, an employee of the insured. The New Hampshire court, in sustaining the validity of plaintiff's tort action against the carrier, held such gratuitous conduct created a duty to use due care which clearly extended to the injured employee. In *Hartford Steam Boiler Inspection & Insurance Co.* v. *Pabst Brewing Co.* (7th cir.) 201 Fed. 617, where boilers gratuitously inspected by the insurer exploded, the policy had been in force for 15 months and it was held that the insurer's continuous conduct of inspection and report (the last being in the month prior to the explosion,) coupled with the representations of its advertising as to the broad scope and value of its inspections, (see: 201 F. at 629), were of "probative force to show both the undertaking of duty and the relation of the parties upon which the action for negligence in the performance thereof may be predicated." Following this the court said: "Inspection of the boilers necessarily requires care and skill in its performance for safety in their use, and, when thus undertaken by the Insurance Company to serve as a benefit to the assured, the duty arises, with or without contract obligation to inspect, to exercise reasonable care and skill in each inspection so made, * * *." (201 Fed. at 629.)

*Van Winkle* v. *American Steam-Boiler Ins. Co.* 52 N.J.L. 240, 19 Atl. 472, presented a situation where the insurance company issued a policy covering a boiler owned by

Ivanhoe Paper Co. and reserved to itself the right to inspect and examine such boiler. It subsequently blew up and damaged the building of Van Winkle, adjacent to that of Ivanhoe, who brought suit against the insurer. The New Jersey court, after first stating it was obvious plaintiff could not predicate his suit on the contract between Ivanhoe and the insurance company, concluded that the issue before it was the legal effect of the acts done by the insurer under the contract, insofar as they affected the rights of plaintiff, a stranger to the contract. The court commented that the insurer was not bound to inspect the boiler, and that if it had not done so no liability to plaintiff could arise. However, the facts of the case disclosed that the insurer had gratuitously made repeated inspections and had also undertaken to furnish its insured with a certificate stating the load that could be put on the safety valve, which conduct caused the court to conclude the insurer had become obligated to make a careful inspection. It was stated (at page 475 of 19 Atl.) : "And it would seem that there is a broader ground than the one above defined, on which the present case can be based. *It is this: that in all cases in which any person undertakes the performance of an act, which if not done with care and skill, will be highly dangerous to the persons or lives of one or more persons, known or unknown, the law, ipso facto, imposes, as a public duty, the obligation to exercise such care and skill.*" (Emphasis ours.) While recently analyzing the *Van Winkle* case in *Viducich* v. *Greater New York Mutual Insurance Co.* 80 N.J. Super. 15, 192 A.2d 596, a New Jersey appeals court again manifested the view that the repeated inspections and the furnishing of certificates for the guidance of Ivanhoe's engineer were circumstances which created a duty upon the insurer to inspect with due care.

In *Sheridan* v. *Aetna Casualty & Surety Co.* 3 Wash. 2d 423, 100 P.2d 1024, the insurer issued an insurance policy on an elevator, the policy reserving the right to inspection.

Thereafter, the insurer made periodic inspections, making reports to the owner and also to the city as an ordinance required. An employee of a tenant in the building was injured by a defective elevator door and brought suit against the insurer, who defended that plaintiff had no rights under the policy and that it was not liable by reason of the inspections made. After reviewing numerous cases holding that the voluntary assumption of a duty renders one liable for its negligent performance, the court concluded (100 P.2d at 1031): "Our conclusion is that respondent's action is maintainable, not by virtue of any obligation imposed by the policy of insurance, but because of the legal responsibility attaching to its voluntary assumption, as the owner's agent, of the duty of proper inspection and reporting to the city." To the same effect is *Bollin* v. *Elevator Construction & Repair Co.* 361 Pa. 7, 63 A.2d 19.

On the other hand, relied upon by defendant, are *Viducich* v. *Greater New York Mutual Insurance Co.* 80 N.J. Super. 15, 192 A.2d 596; *Zamecki* v. *Hartford Accident & Indemnity Co.* 202 Md. 54, 95 A.2d 302; and *Ulwelling* v. *Crown Coach Corp.* 206 Cal. App. 2d 96, 23 Cal. Reptr. 631, where the circumstances of the gratuitous inspections by insurers were held to create no enforceable duty to the plaintiffs involved. However, in the *Viducich* case, but one inspection was made of a new business venture, and it appeared that the only purpose of the inspection was to determine the "insurer's remuneration." Under such circumstances the New Jersey court held no duty to inspect with due care had arisen as to the plaintiff, an employee of the insured who was later injured due to the absence of a guard on a machine. Comparably, in *Ulwelling*, an inspection of an insured's buses in October, 1956, was for the purpose of rating a new account, while a subsequent inspection in January, 1957, made after the policy had issued and 9 months before the occurrence which prompted the suit, was done on a sampling basis, did not include the bus involved in the

mishap, and was not performed by a trained or expert inspector. These circumstances, as well as proof showing that 75% of 80% of the insurer's gratuitous safety engineering services were directed to road patrol service, led the California court to conclude the inspections were not of such nature as would impose upon the insurer any duty owing plaintiffs, the latter being either passengers or representatives of passengers in a bus that crashed when a drive shaft separated and damaged the air brake system. In the *Zamecki* case, which was decided on the pleadings, it was alleged by a patron injured in the collapse of a temporary grandstand that the promoter's insurer had gratuitously and negligently inspected the stands, and had failed to advise plaintiff of their faulty construction. The Maryland court, in what would appear to be a distinct minority view, was of the opinion that no duty could arise from voluntary inspection, as distinguished from voluntary maintenance.

The proof in the present case fully negates any concept that defendant's gratuitous inspections were solely for its own internal purposes, and likewise refutes the allegations in its answer denying that safety inspections had been made, or that it had made regular and periodic inspections. At the time and immediately prior to the date Auchter took out its compensation and public liability policies on the courthouse project, defendant constantly represented that those who insured with it would receive countless extra safety and monetary benefits through the services of defendant's "safety experts" or "safety engineers." An advertising symbol referred to as "Mr. Friendly" was adopted, and by a series of advertisements placed in both national and trade publications, such representations as the following were made: (1) "In case after case, month after month, American Mutual's safety engineering service has helped contractors all over the country reduce accidents and costs;" (2) that insureds "have

worked hand in hand with American Mutual Safety Engineers to build safety into every job;" (3) after explaining that one insured had saved money, the method was stated to be: "Close cooperation between Hittig Management and American Mutual Safety Engineers in designing and operating an effective safety program;" (4) "Thanks to thorough investigation and hazard analysis  *  *  *  and immediate investigations when accidents have occurred, this nationally known firm has been able to maintain a good accident record and to lower operating costs." These are but samplings of many representations that could be stated, but, in general, the tenor of each of the 29 advertisements admitted in evidence was that the safety engineers took an active part in the safety programs of the insureds and saved lives, limbs and money. A former executive of defendant, testifying directly to the function of the safety engineers, stated that it was to help the insureds to reduce accidents and to determine what were or were not unsafe practices. From all of the evidence it appears that defendant's safety engineers, and the various financial and safety benefits claimed to inure to insureds as a result of their safety engineering services, were its chief stock in trade. Just as certainly, it appears beyond a shadow of a doubt that the services gratuitously given by the engineers were not solely for defendant's own purposes.

Auchter, as one of the "Mr. Friendly" ads stated, had done business with defendant for 20 years. Because Auchter was a risk from whom annual premiums in excess of $25,000 were received by defendant, Auchter was classified as a "special risk", and as such, was given defendant's safety engineering services. At and prior to the occurrence here involved, defendant's employee who serviced Auchter was H. D. McClain, its district engineer for the State of Florida. Before that he had been district engineer in Tennessee, and had for many years inspected elevators for defendant.

McClain first went to the job site in the summer of 1955 while the demolition of previous buildings was going on, and there appears to be no question but that the purpose of this visit was to determine and report conditions so as to allow defendant's underwriting department to determine forms and rates of insurance. Construction started on the building sometime prior to October 10, 1955, and while it was McClain's testimony that he made but seven visits to the site up to March 19, 1957, when the hoist fell, (the last such visit being February 12, 1957,) witnesses for plaintiff testified he was on the site more frequently. McClain said his visits averaged about four hours, during which he would go over the entire project, concerning himself with housekeeping conditions, machine hazards, and the hazards of falls and falling objects. Further, he stated that during every visit he would see either Arthur Avent, Auchter's administrative engineer on the job, or Sidney Hodge, the project superintendent, with whom he discussed conditions and whom he found co-operative.

After each visit or inspection, McClain made various reports to his own company and wrote a letter to Auchter, the insured. His first visit after construction started took place over October 10 and 11, 1955, and his engineering report on this occasion stated: "A visit has been scheduled in November 1955. * * * At that time the engineer prepares to continue his accident prevention work and to assist the assured in making the job safe." The next formal report followed a visit by McClain on January 10, 1956, wherein he wrote: "Service plans have been set forth in previous reports and bi-monthly service upon a regular basis has been scheduled to this job until completion." Thereafter, formal reports were submitted showing visits in March, June, September and October of 1956, and in February of 1957. In the September 1956 report it was said: "The purpose of this visit was a periodic maintenance visit to observe continued operations on this project and to main-

tain policy holder service." On each occasion his engineering reports represented that he had inspected and analyzed "catastrophe" and "serious" hazards, including "Machine hazards." On a separate report form, McClain listed the machinery and equipment being used on the job and described their use and operation. After June, 1956, this form noted that there were "elevators" on the project, which were "typed" as builder's hoists, owned by the insured.

Following each visit formally reported to his employer, McClain, as we have said, also wrote letters to Auchter describing the visits and making representations of which the following are typical: (1) "I plan to again be in Jacksonville within a few weeks and will visit both of the above jobs again as a continuation of our service to you in the control of accident possibility;" (2) "I plan early visits in November to assist your superintendents;" (3) "Continuing our engineering service to you in making your operations safe * * * I made a survey of your operations and from an over-all standpoint found job practices satisfactory from a safety standpoint;" (4) "Continuing our engineering service to you and a maintenance of your loss control program, I called at the jobs in caption;" (5) "To assist you further in your accident control at the job, I suggested to Mr. Hodge that he ground the frame of the builder's hoist."

Copies of the safety engineer's inspection reports and surveys, as well as any recommendations made to the insured, were transmitted to various of defendant's departments, including sales and engineering. A former employee in the sales department testified that if at any time the recommendations were not complied with, the sales department would be requested to contact the risk to see that there was compliance. "Normal recommendations," he said, would not require any action on the part of the sales department, but those of an "urgent" nature would be fol-

lowed up by the sales manager whose duty it was to see that there was immediate compliance on the part of the insured. Instructions from the home office were that if urgent recommendations were not complied with, cancellation notices would be issued and the risk normally cancelled. The exact action taken by the engineering department with regard to recommendations does not fully appear, but it does appear that, on one occasion at least, McClain went to Auchter's president when he met with some recalcitrance on the part of Hodge, the project superintendent, and one of the men with whom McClain directly discussed his inspections and findings. On each succeeding visit, McClain would check to see if his recommendations were carried out.

Taken in its entirety, all of this evidence leads solely to the conclusion that defendant did gratuitously undertake to make safety inspections and to render safety engineering services on the courthouse project, and that such inspections were planned, periodic and directed to the safety of the employees on the project. Under these circumstances, which parallel in some instances and exceed in others the circumstances in the *Smith, Pabst* and *Van Winkle* cases, it is our opinion that duty devolved upon defendant, owed to the plaintiffs, to make its inspections with due care. Of a certainty, defendant's present efforts to characterize McClain's activities as nothing but "casual observation" for its "own purposes," cannot be squared with the scope of the activities which were represented in the advertising, reports and letters before any question of liability arose. We hold that an enforceable duty to plaintiffs did arise as the result of defendant's gratuitous undertaking in this case.

Before looking to the evidence relating to the issue of whether defendant failed to use due care, or the skill and competence that it possessed, in the performance of its gratuitous undertaking, we think it well to first consider defendant's contentions: (1) that the absence of any reliance by either Auchter or plaintiffs upon McClain to inspect the

hoist is a bar to the plaintiffs' actions; (2) that defendant's absence of control over Auchter or the hoist is a bar to the plaintiffs' actions; and (3) that the absence of privity between plaintiffs and defendant is a bar to plaintiffs' actions.

Treating upon these contentions in reverse order, the claim of the need for privity may be disposed of quickly. Florida, like Illinois and the vast majority of jurisdictions, has long since refused to permit the ancient shield of privity to insulate a tort feasor from the consequences of his negligent conduct. (See: *Hoskins* v. *Jackson Grain Co.* (Fla.) 63 So. 2d 514; *Wintersteen* v. *National Cooperage and Woodenware Co.* 361 Ill. 95; *Durham* v. *Warner Elevator Mfg. Co.* 166 Ohio St. 31, 139 N.E.2d 10.) Speaking directly as to the liability of a gratuitous actor, a Florida court stated in *Banfield* v. *Addington,* 104 Fla. 661, 140 So. 893: "And even 'where a man interferes gratuitously, he is bound to act in a reasonable and prudent manner according to the circumstances and opportunities of the case. And this duty is not affected by the fact, if so it be, that he is acting for reward, in other words under a contract, and may be liable on the contract. The two duties are distinct, * * *.' "

Similarly, the circumstance that defendant did not control Auchter or its equipment and employees cannot relieve it from liability for the consequences of its negligence. (*Cf. Kahn* v. *James Burton Co.* 5 Ill.2d 614, 620.) Defendant's duty here did not arise by virtue of its control, or right to control, the equipment, and neither did it arise as the result of any relationship with Auchter or its employees. The duty arose, rather, by operation of law from defendant's own independent and gratuitous course of conduct. Moreover, plaintiffs' charges of negligence are not based upon a defect in the equipment or upon conduct of Auchter's employees, but upon defendant's negligent performance of its gratuitous undertaking. The *Smith, Pabst* and *Van Winkle* cases, as well as *Triolo* v. *Frisella,* 3 Ill. App. 2d 200, are a

complete rejection of any concept that control of the premises where negligence occurs is essential to the liability of a gratuitous actor.

Defendant's contention that the element of reliance is essential to its liability to plaintiffs is founded upon the premise that defendant was charged "only with nonfeasance, a failure to report a risk, or dangerous situation, already existing," (39 Ill. App. 2d at 122,) and upon the argument that whenever a duty arises from an undertaking, gratuitous or otherwise, the *sine qua non* for liability for nonfeasance, *i.e.* the omission to perform the undertaking, is reliance by the person to whom the undertaking was directed or by the person injured. This theory, however, either overlooks or misapprehends that defendant was charged with misfeasance, to-wit, that it gratuitously undertook to make safety inspections of the equipment and practices of its insured, and that it had "carelessly and negligently *performed* the said inspections on a certain elevator or hoist so that as a direct and proximate result thereof certain plaintiffs were injured and decedents of certain plaintiffs killed." (Emphasis ours.) Defendant was not charged with liability for omitting to perform an undertaking which plaintiffs or Auchter expected or relied upon it to undertake, (see: *United States* v. *DeVane,* (5th cir.) 306 F.2d 183; Restatement of Torts, § 325,) but was charged with having undertaken to perform safety inspections, a lawful act, and with having done so carelessly and negligently. (See: *Smith* v. *American Employers' Ins. Co.* 102 N.H. 530, 163 A.2d 564; Restatement of Torts, § 323 (1).) By undertaking to act defendant became subject to a duty with respect to the manner of performance. (*Banfield* v. *Addington,* 104 Fla. 661, 140 So. 893, 896; *Roesler* v. *Liberty National Bank of Chicago,* 2 Ill. App. 2d 54, 58-59; *Marks* v. *Nambil Realty Co.* 245 N.Y. 256, 157 N.E. 129, 130.) That duty, as we have pointed out, extended to plain-

tiffs and was a duty to use due care, or as the Restatement of Torts puts it, defendant's duty was "to exercise such competence and skill as (it) possesses." § 323(1).

We think it clear under the law that defendant's liability for the negligent performance of its undertaking, as distinguished from a failure to perform, is not limited to such persons as might have relied upon it to act but extends instead to such persons as defendant could reasonably have foreseen would be endangered as the result of negligent performance. It is axiomatic that every person owes to all others a duty to exercise ordinary care to guard against injury which naturally flows as a reasonably probable and foreseeable consequence of his act, and that such duty does not depend upon contract, privity of interest or the proximity of relationship, but extends to remote and unknown persons. (*Kahn* v. *James Burton Co.* 5 Ill.2d 614, 622; *Wintersteen* v. *National Cooperage Co.* 361 Ill. 95, 103; *Smith* v. *American Employers' Insurance Co.* 102 N.H. 530, 163 A. 2d 564; *Van Winkle* v. *American Steam-Boiler Ins. Co.* 52 N.J.L. 240, 19 Atl. 472, 475; *Cf. Ziraldo* v. *Lynch Co.* 365 Ill. 197; Restatement of Torts, § 311 (2).) Plaintiffs, as workmen on the project, were the chief beneficiaries of the safety inspection and safety engineering services rendered by defendant, and we need not labor the point that defendant could reasonably have expected and foreseen that they would be endangered by its failure to use due care.

To sustain its claim that reliance is essential to its liability defendant relies heavily upon *Viducich* v. *Greater New York Mutual Insurance Co.* 80 N.J. Super. 15, 192 A.2d 596, and upon analogies drawn from the Restatements of Agency, Torts and Contracts. The language of the *Viducuch* opinion relied upon, however, has little persuasion. Not only does it appear to be *dictum,* but the New Jersey court itself left unanswered the question whether proof of reliance is an absolute essential "in every case in which it is sought to hold a gratuitous undertaker." (192

A.2d at 601.) Nor do the sections of the Restatements advanced by defendant have any persuasive or controlling analogy to this case. Section 378 of the Restatement of Agency, section 325 of the Restatement of Torts and section 90 of the Restatement of Contracts all have reference to the situation where a person is injured because he was either induced to act or to forbear from acting because of reliance upon conduct or promises of another. None apply to the facts here, and, moreover, plaintiffs' actions are predicated upon section 323(1) of the Restatement of Torts, *viz.*, the negligent performance of a gratuitous undertaking, which does not require reliance as a basis for liability. In like manner, section 354 of the Restatement of Agency has no value here; it has reference to liability arising from an agent's "subsequent unexcused failure to act," after having previously acted in such a manner as to cause his principal or others to rely upon him.

Plaintiffs have argued that if reliance by Auchter is essential to defendant's liability to them, the proof is such that the jury could find with reason that Auchter had in fact relied upon defendant's safety inspections. Without making an extended analysis of the pertinent evidence, we believe that there is merit in this contention. However, for the reasons already stated, it is enough to say that reliance, either by plaintiffs or Auchter, was not an absolute essential to the liability of the defendant in this case.

Relying largely upon inspection and maintenance cases where the scope of undertaking, duty and liability were determined by contract, (*e.g. Wolfmeyer* v. *Otis Elevator Co.* (Mo.) 262 S.W.2d 18; *Otis Elevator Co.* v. *Embert,* 198 Md. 585, 84 A. 2d 876; and *Blackhawk Hotels Co.* v. *Bonfoey,* (8th cir.) 227 F.2d 232,) defendant also injects a contention that it could be liable to plaintiffs only if it had assumed entirely Auchter's duty of inspecting the hoist and cable. We do not find, however, that such a condition attaches to the liability of one gratuitously making safety in-

spections. In the *Smith, Van Winkle* and *Pabst* cases duty and liability were found to arise even though the voluntary inspections had been periodic, and we are persuaded by the holding in *Van Winkle* that the gratuitous inspector became subject to an enforceable duty to use due care "as soon as it took part, practically, in the management of this machine." (19 A.2d at 475.) Moreover, it is fundamental in the law of negligence that there may be more than one proximate cause of injury, (*De La Concha* v. *Pinero,* (Fla.) 104 So.2d 25; *St. Louis Bridge Co.* v. *Miller,* 138 Ill. 465,) and that one is liable for its negligent conduct whether it contributed in whole or in part to the plaintiff's injury, so long as it was one of the proximate causes of injury.

Turning to the material facts, Auchter purchased the construction hoist from Archer Iron in late 1955, and erected it at the courthouse project in May, 1956, ten months before the occurrence which led to plaintiffs' actions. The hoist bail, with the platform attached, was raised and lowered by a steel cable and moved along vertical guide rails on each side, the guide rails being attached to the tubular metal pipes which made up the hoist tower. Built into the bail was a device known as a "broken rope safety," consisting of two serrated jaws, or "dogs," opposite the two guide rails. The dogs remained retracted so long as the weight of the car hanging from the cable exerted pressure on the top of the bail, but, through the action of cams and springs, would extend out and engage the guide rails as soon as pressure was released on the cable. The pressure and traction exerted by the dogs on the guide rails was thus supposed to arrest the gravitational fall of the platform. As is explained in greater detail in the opinion of the Appellate Court, a new ¾-inch cable manufactured by Union Wire was installed, and a one-part line was rigged between the hoist and a drum, activated by a motor, upon which the cable was wound. To accomplish this rigging, two new sheaves furnished by Archer Iron were employed. These

sheaves had an outer diameter of 19 inches, and an inner diameter of 16 incres at the bed of the groove. Within a short time after the hoist had gone into operation, Auchter, to slow down the speed of the platform, re-rigged the cable and made a two-part line by affixing a third sheave to the top of the bail. This sheave, which was used and had been obtained from Auchter's construction yard, had an inner diameter of slightly less than 10 inches. It was in plain view, and easily accessible for inspection.

Once in operation the hoist was used to transport building materials and, except for the period during which it was being re-rigged, the uncontroverted proof in the record is that personnel of all categories on the project, laborers, supervisors and company executives, constantly rode on the hoist up to the time it fell. There was evidence that stairways in the building under construction were ill-lit, cluttered with scaffolds, waste and materials, and sometimes closed; and it further appears that the greatest use of the hoist by personnel was at starting and quitting times. On the day of the occurrence, at quitting time, the 18 plaintiffs and another workman got on the platform at fifth floor level. After they had done so, the cable broke and the platform plunged to the ground.

Following the accident the cable, the sheave added by Auchter, and portions of the hoist tower were sent to the Pittsburgh Testing Laboratories, an impartial testing agency agreed upon by all parties. From tests and inspections made it was the virtually uncontradicted testimony of the experts participating that excessive cable wear due to a faulty sheave and the inadequacy of the broken rope safety device were contributing causes of the tragedy. Examination of the cable revealed that it was practically disintegrated for a distance of 21 feet, and it was ascertained that the break had occurred at a point where the cable passed over all three sheaves. The bed of the groove in the sheave added by Auchter was found to be worn and corrugated in

a herringbone pattern, and when measured with a gauge the groove was found to be out of contour due to uneven wear patterns on the groove walls. This condition, according to an expert witness, would subject the cable to abnormal forces and skidding actions which would hasten its wear. Since wire cable bends around sheaves at an angle of 90 degrees, all witnesses agreed that there was a direct relation between cable wear and the size and condition of the sheave, and, in such regard, there was expert testimony that a cable passing over a 10-inch sheave, would wear out $2\frac{1}{2}$ to 5 times faster than one passing over a 16-inch sheave.

Scientific tests of the tower and its broken rope safety device, which we deem it unnecessary to detail, revealed that the forces exerted on the guide rails by the serrated jaws, or dogs, caused the rails to deflect outwards to such a degree that the safety device, with the platform falling from fifth floor level, could halt only a fall of 1300 pounds, which was but 300 pounds in excess of the weight of the hoist platform.

It is plaintiffs' contention that safety inspections made with due care, or which such care and skill as the safety engineer possessed, would have disclosed the dangerous conditions which ultimately caused the hoist to fall. Defendant, which has argued on every conceivable front, contends first that its safety inspections and services did not extend to the hoist, but that McClain made only casual and visual observations of the hoist as a matter of general interest. Considering the evidence most strongly in plaintiffs' favor and giving it every reasonable intendment favorable to them, as we must under the circumstances of the appeal, (*Pennington* v. *McLean,* 16 Ill.2d 577, 582; *Seeds* v. *Chicago Transit Co.* 409 Ill. 566, 571,) it is our conclusion that the jury could reasonably find that the scope of McClain's safety inspections did extend to the hoist.

When queried directly as to the relationship between his periodic visits and the hoist, McClain stated: "I did not inspect this equipment as a man employed by Auchter or as

a man employed by any sub-contractor. I was interested in this piece of equipment as it related to the job as a whole, to whatever exposure was on the job. By exposure I mean injury or property damage." His activities bear out these admissions. In June, 1956, on his first visit after the hoist went into operation, McClain did many things which extended beyond casual observation. He determined the kind and operation of the safety device on the hoist; sighted to see if the guide rails, essential to the functioning of the safety device, were in good alignment; ascertained from Hodge that a drop test of the safety device had been made; discussed with Hodge the anticipated loading; determined the size and breaking point of the cable being used; calculated that the cable had a safety factor of seven times loaded capacity; determined the rigging of the hoist and how it had been changed; and discussed with Hodge the lubrication and maintenance of the cable. On the same visit, McClain, by his version, "suggested" to Hodge that the tower be grounded against lightning, although Hodge put it this way: "Early on the job McClain told me to get the tower grounded. I did that." Indeed, the proof shows without contradiction that every recommendation made by McClain was complied with.

On other occasions McClain checked to see if the tower had guy wires to keep it from toppling over, and inspected the brake drums for the presence of oil that might cause the brakes to slip. Further, it appears that he gave his attention to the hoist on every visit after it started operating, his specific testimony being: "On February 12 (the last visit before the occurrence) I made my usual visual observation of the tower. I saw the lift platforms going up and down and they seemed reasonably smooth. I didn't notice anything out of order. * * * It was my custom when I visited the job to look at the cable between the swivel deflector sheave and the engine. I noticed nothing that gave me any particular concern." And while McClain's trial

characterization of his conduct was "visual observation," the reports he made after each visit, before the question of liability arose, represented that he made inspections and surveys of machine hazards, one report form indicating that the insured was operating two builder's hoists. In short, the tenor and intendment of all the evidence is that defendant's gratuitous engineering services did extend to the hoist.

There is uncontradicted evidence in the record, including testimony of McClain himself, that in order to inspect a cable adequately it is necessary to clean off the grease at intervals, to run the hand along the cable feeling for spurs, to use a magnifying glass for close inspection and to use a spike to separate the strands in order to locate breaks in the valley of the rope. Similarly, there is evidence that a complete inspection of a sheave would entail the use of a groove guage, and of a hammer and a magnifying glass to test and seek for cracks. McClain did none of these things. Instead, he merely examined the sheave at the top of bail only insofar as he could see it from the ground and, as noted, only looked at the cable "between the deflector sheave and the motor." An experienced passenger elevator inspector for his company, McClain explained his failure to make a detailed inspection of the cable and sheaves by stating that the hoist was not classified and rated as an elevator. Apropos of this explanation, McClain testified he had been initially told by Hodge that there would be no riding on the hoist, denied that he had ever ridden the hoist or had seen men riding it, and stated that had he known of this practice he would have recommended against it. As opposed to this, two workmen on the project testified they had seen McClain riding the hoist, while Avent, the project manager, Hodge, and two workmen testified that men were riding the hoist while McClain was on the premises. Many impartial witnesses testified that men rode the hoist all day long from the time the hoist went into operation, and it likewise appears that it was the custom in Jacksonville for work-

men to ride construction hoists. The jury, whose function it was to determine where the truth lies, could with reason conclude from all of the evidence that McClain knew, or should have known, that personnel were riding the hoist, and in fact using it as a passenger elevator.

Plaintiffs insist that McClain's failure to adequately inspect the cable and sheaves was a negligent performance of the gratuitous undertaking. Defendant, on the other hand, argues that the evidence merely shows that its gratuitous services did not extend to a complete and thorough inspection of the hoist and its components, and contends that it cannot be held negligent for not doing enough in the way of gratuitous services. For our part we believe the resolution of the issue rested with the jury in its traditional function of determining whether particular facts amount to an exercise of due care or a want thereof. The courts of Florida, like those of Illinois, have consistently held that what is and what is not negligence in a particular case is generally a question for the jury and not for the court, (*Weis-Patterson Lumber Co.* v. *King,* 131 Fla. 342, 177 So. 313, 318; *Orr* v. *Avon Florida Citrus Corp.* 130 Fla. 306, 177 So. 612; *Handel* v. *Rudnick,* (Fla.) 78 So. 2d 709; *Ney* v. *Yellow Cab Co.* 2 Ill.2d 74, 84,) and we find it stated in *Cobb* v. *Twitchell,* 91 Fla. 539, 108 So. 186, 188: "The degree of care required to be used in any given case to avoid the imputation of negligence must be according to the circumstances or in proportion to the danger reasonably to be anticipated; such care as is ordinarily sufficient under similar circumstances to avoid danger and secure safety."

As previously stated, a jury of reasonable and fairminded men could reach the conclusion from all of the evidence that the interest and activity of defendant with respect to the hoist were not limited to its post-accident claim of casual observation, but in fact extended, as McClain once testified, to whatever exposure to injury and property damage attended the operation of the hoist on the project. The

Auchter company employed no safety engineer or safety inspector of its own, and this was the company's first experience with a manufactured metal hoist. As opposed to this, McClain was a trained and practicing safety engineer, and as a qualified elevator inspector was fully aware of the relationship between cable wear and proper sheaves and of the only sure and safe way to inspect both. Under all of the circumstances, most particularly the circumstance that McClain knew, or should have known, personnel were riding the hoist, we think the same jury of reasonable and fair-minded men could conclude that the exercise of ordinary care, or of the skill and competence the safety engineer possessed, would have required McClain to adequately and properly inspect the cable and sheave, or at least to insure that such inspections were being made. In regard to the latter, McClain did ascertain whether defendant's insured was inspecting the hoist, but clearly made no effort to see that safe and adequate inspections were made. While there was some conflict as to whether Auchter was inspecting the cable at all, the employee who testified that he did so had no special training or instruction, conceded that he did not examine the sheaves, and testified that his cable inspections were accomplished by getting on the platform and merely looking at the cable as the operator slowly ran the platform to the top of the tower and down again. This, according to expert testimony, was tantamount to no inspection at all.

Claiming the privilege of supporting its judgment in the Appellate Court upon any basis appearing in the record, (see: *Becker* v. *Billings,* 304 Ill. 190; *Hazel* v. *Hoopeston-Danville Motor Bus Co.* 310 Ill. 38,) defendant asserts, admittedly for the first time in this court, that it cannot be guilty of negligence because there is no evidence that a reasonably careful inspection of the cable by McClain would have disclosed that it was unsafe. While it is our opinion there is no proper basis in the record to permit this con-

tention to be made, (see: *In re Estate of Leichtenberg, 7 Ill.2d 545, 548-549,*) it is equally untenable on its merits. The whole body of the evidence discloses that the small and defective sheave added by Auchter caused excessive cable wear and damage.

We are in accord with plaintiffs that the jury could also reasonably find from the evidence that McClain, under the circumstances of the case, failed to exercise due care with respect to the safety device on the hoist. The most important circumstances are, again, that McClain, unlike the manufacturer of the hoist, was chargeable under the evidence with knowledge that personnel were riding the hoist, and that McClain was trained and experienced in the matter of testing such devices, whereas Auchter's employees were not. There is evidence that a proper testing of the safety device would have been to make two drop tests with the platform bearing 120% of the manufacturer's rated load. As opposed to this, Hodge testified he made but one test and that by merely raising the unloaded platform to a height of six to eight feet and letting it fall. McClain knew the importance of the safety device, and, as previously detailed, once the hoist was put into operation took steps to determine the type of safety device, the alignment of the rails and whether functional tests had been made. He did not, however, concern himself with the adequacy of the test then or later, even though he knew, or should have known, that the hoist was in effect being utilized as a passenger elevator. Had an adequate test been made, and had McClain exercised the safety engineering skill the situation demanded, it would have been discovered that the safety factor of the device was only 300 pounds in excess of platform weight.

Considering the record as a whole, we cannot say as a matter of law, that the evidence fails to establish a reasonable basis from which the jury could arrive at the con-

clusion that defendant was guilty of negligence which contributed in whole or in part, to plaintiffs' injuries and deaths.

Turning next to defendant's affirmative defense that the Florida Workmen's Compensation Act gives it immunity from suit as a third party tort-feasor, it may be said, to use the words of the court in *Fabricius* v. *Montgomery Elevator Co.* (Iowa) 121 N.W.2d 361, that the real question presented is whether there is anything in the Florida act which deprives plaintiffs of their right to proceed at common law against the workmen's compensation carrier for the general contractor. The Florida act expressly preserves the employee's common-law action against a third party tort-feasor, without stating who shall or shall not be third party tort-feasors, (F.S.A. sec. 440.39(1),) but it may be conceded here, without the need of detailed analysis of the act or the judicial decisions construing it, that Auchter, as the general contractor, is immune from suit as a third party tort-feasor both as to its own employees and the employees of its subcontractors. (See: *Brickley* v. *Gulf Coast Construction Co.* 153 Fla. 216, 14 So.2d 265.) Thus, stated differently, in terms of defendant's contention, the issue raised is whether defendant, as the compensation carrier for the general contractor, enjoys the tort immunity of its insured. The precise problem has never been passed upon by the Florida courts in the factual setting of this case; however, we find clear-cut decisions treating upon the question of tort immunity under compellingly analogous situations which stand as guidelines to our decision.

Most persuasive is *Frantz* v. *McBee Co.* (Fla. 1955) 77 So.2d 796, where it was held that the Florida act did not extend immunity from suit as a third party tort-feasor to a co-employee, or fellow worker, of an injured workman. After pointing out that the Florida act, unlike those of some States, did not in express terms give a co-employee immunity from suit as a third party tort-

feasor, the court said of the act and the construction to be placed upon it: "It provides only that 'The liability of the employer prescribed in § 440.10 shall be exclusive and in place of all other liability *of such employer* \* \* \*,' Section 440.11 (emphasis supplied); and it expressly preserves to an injured employee a concurrent remedy against a third party tort-feasor, without definition as to who is a 'third party tort-feasor.' Section 440.39(1). There is nothing in our Act which expressly or by necessary inference requires this court to hold that the Legislature intended to abrogate the common-law rule respecting the liability to an injured employee of a negligent coemployee. Under these circumstances and under the ordinary rules of statutory construction, we cannot read into the statute a provision which would be in derogation of a common-law right of an injured employee."

To further resolve the issue, and in response to a contention that language in *Younger* v. *Giller Contracting Co.* 143 Fla. 335, 196 So. 690, required tort immunity to be extended to a co-employee, the court continued in the *Mc-Bee* decision (pp. 799-800): "A recent decision by this court, *Jones* v. *Florida Power Corp.* (Fla. 1954) 72 So.2d 285, 287, charts the path which we should follow in our decision here, much more than does the dictum in the *Younger* case. In the *Jones* case, we held that 'It is the liability to secure compensation which gives the employer immunity from suit as a third party tort-feasor. His immunity from suit is commensurate with his liability for securing compensation—no more and no less.' There is, of course, no liability on the part of an employee to secure compensation for a co-employee. *And since there is no liability under the Act, there is no immunity from suit under the Act.*" (Emphasis ours.)

Again, in *Jones* v. *Florida Power Corp.* (Fla. 1954), 72 So.2d 285, where the power company claimed tort immunity as the "common employer" of the employees of two inde-

pendent contractors engaged in a construction project for the company, the court said at page 289: "The record does not show, nor is there any allegation, that the Corporation, as to the construction project in which plaintiff was employed, was liable for and required to secure compensation for the employees of Burns and Grinnell as an 'employer' engaged in this particular construction job. *And, as heretofore noted, if there was no liability as an employer under the Act, there was no immunity from suit as a third party tort-feasor.*" (Emphasis ours.)

We believe it patently obvious that these decisions require us to reject defendant's claim to immunity from suit as a third party tort-feasor. Nowhere does the Florida act provide that the compensation act shall be the exclusive remedy against the employer's carrier, or provide that such carrier shall enjoy immunity from suit as a third party tort-feasor, and for us to read those provisions into it would be to ignore the stern and persistent admonition of Florida courts that the common-law action of an injured workman is preserved unless there is something in the act which takes it away. (See: *Hartquist* v. *Tamiami Trail Tours,* 139 Fla. 328, 190 So. 533, 538; *Martin* v. *Theockary,* (5th cir.) 220 F.2d 900, 901.) But of even greater significance is defendant's failure to meet the test laid down in the *Jones* and *McBee* decisions for the determination of immunity from suit as a third party tort-feasor. Under the Florida act, a compensation carrier for an employer has neither the duty nor the liability to secure workmen's compensation for the employees of its insured, or for the employees of its insured's subcontractors, and thus does not possess the essential requisite for tort immunity.

Conceding as it must that there is no provision in the act which gives it immunity from plaintiffs' suits in express terms, defendant contends generally that the use of the alternative phrase "employer or his insured" in some sections of the Florida act, (particularly in section 440.39

wherein the employee's common-law action against a third party tort-feasor is preserved,) manifests a legislative intent to equate the employer and his insurance carrier for all purposes, including immunity from suit as a third party tort-feasor. Whether we look to the language of the act itself, or to the basic rules of statutory construction, this contention cannot stand.

The Florida act does not include the insurer in its definition of an employer, but reads as follows: "(4) The Term 'employer' means the state and all political subdivisions thereof, all public and quasi-public corporations therein, every person carrying on employment, and the legal representative of a deceased person or the receiver or trustees of any person." (F.S.A. sec. 440.02(4).) Had there been a legislative intent to equate the employer and its insurance carrier for all purposes under the act, surely this definition would have equated them. Again, in section 440.11, (F.S.A. sec. 440.11,) which is necessarily a key section to the issue raised, the legislature provided that the liability of the "employer" for compensation shall be exclusive and in place of all other liability to such employee. The word "insurer" is not mentioned either separately or conjunctively, and under the fundamental rule of statutory construction that the mention of one thing excludes all other things not mentioned,· (*Dobbs* v. *Sea Isle Hotel,* (Fla. 1952) 56 So.2d 341,) the insurer is thus excluded from the exclusive liability imposed upon the employer. Once again, it may be remarked that had it been the intent of the Florida legislature to equate the employer and insurer for all purposes, it would likewise have conferred exclusive liability upon the insurer in this section.

When section 440.39 was reached, the legislature, by subparagraph (1), preserved the employee's common-law action against third party tort-feasors. No exception was made as to insurance carriers despite the fact the succeeding subparagraphs went to great lengths to spell out

the rights of such carriers in the event the employee or his dependents brought or were entitled to bring suit. Having taken the pains to spell out the rights and status of an insurer, we think the Florida legislature would have expressly granted tort immunity to insurers had that been its intent.

Similarly, the use of the word "employer" in some sections of the act, while using the words "employer, or his insurer" in others, has significance under the rules of construction which state that words employed are to be given their plain meanings, and that the use by the legislature of certain language in one instance and wholly different language in another indicates that different results were intended. (See: *Florida State Racing Commission* v. *Bourquardez*, (Fla. 1949) 42 So.2d 87; 50 Am. Jur., Statutes, sec. 274.) Had it been the legislative intent that all rights, duties and liabilities of the employer and his insurer were to be equated, particularly as to the matter of exclusive liability, it would not have mentioned the insurer as an alternate in some sections, while failing to mention it in others.

A case precisely and convincingly in point is *Mays* v. *Liberty Mutual Insurance Co.* (3rd cir.) 323 F. 2d 174, which was filed August 26, 1963, and reversed an earlier district court decision reported at 211 F. Supp. 541. There, as in the present case, a compensation carrier claimed immunity from suit as a third party tort-feasor because the Pennsylvania Compensation Act in some instances employed the alternative phrase "employer, or insurer." The statutory definition of "employer," however, exactly like that of the Florida act, made no mention of the insurer. Pointing to this definition, the Circuit Court of Appeals said: "In this respect the definition in that section supports the position of Mays, for when the legislature intended to equate the insurer with the employer, it did so specifically in unequivocal terms. Its failure to do so in the clear, un-

ambiguous definition found in § 103, 77 Purdon's Pa. Stat. Ann. § 21, is an indication that it did not intend to blend their jural personalities."

Defendant next urges that the third party tort-feasor referred to in subparagraph (1) of section 440.39 must necessarily be some person other than the insurance carrier, because the succeeding subparagraphs provide, in substance, that an insurance carrier is subrogated to the right of the employee or his dependents against the third party tort-feasor to the extent of compensation benefits paid; that the common-law action shall be brought by the employee or his dependents individually, and for the use and benefit of the employer or the insurer, as the case may be, if compensation benefits have been paid; that the employer or the insurer shall have a lien to the extent of medical and compensation benefits paid; that the employer or insurer may bring the action against the third party tort-feasor if the employee or his dependents have not done so within a year; and that where suit is brought by the employer or insurer, no settlement shall be made except upon the agreement of the injured employee or his dependents. (See: F.S.A., sec. 440.39.) Specifically, defendant contends that if a compensation carrier can be sued as a third party tort-feasor, the absurd and incongruous result will be that an insurer will have a right of subrogation and lien against itself, and in the event the employee does not start the suit, the insurer will be placed in the position of settling with or suing itself. Although not without some surface appeal, we find defendant's claim to immunity from suit as a third party tort-feasor upon such reasoning has been judicially rejected under circumstances and statutes not materially different from those of this case.

One such case is *Fabricius* v. *Montgomery Elevator Co.* (Iowa 1963) 121 N.W.2d 361. That, too, was a suit by an employee against his employer's compensation carrier as a third party tort-feasor, and involved the compensation

act of Iowa which, like that of Florida, neither expressly granted tort immunity to the insurer nor made the act the exclusive remedy against the insurer. Also, like the Florida act, the Iowa statute gave the insurer the right of subrogation and lien against any recovery effected by the employee against the third party tort-feasor. In holding that such subrogation and lien provisions did not operate to give the insurer tort immunity the Iowa court stated: "If the employee's common-law action is taken away from him, what has done so? Certainly it cannot be the insurance policy. We do not find a statute that imperatively compels that result. Because the insurer may be indemnified and subrogated does not compel that result. *It does not deal with the subject matter.* Likewise, we are not persuaded by the argument the insurer would be placed in the position of suing itself. It is easier to believe the legislature intended the insurer to have a set-off to the extent of compensation paid." (121 N.W.2d at 364-365.) (Emphasis ours.)

A second and even more recent case is *Mays* v. *Liberty Mutual Insurance Company,* (3rd cir. 1963) 323 F.2d 174, to which we have previously alluded. There, in reaching a conclusion that the subrogation and lien provisions of the Pennsylvania compensation act did not confer upon the employer's insurer immunity from suit as a third party tort-feasor, the court adopted the reasoning of *Fabricius,* quoted above, and likewise held that the article dealing with subrogation and lien "relates solely to procedure" and in no manner modified the section of the act which defined "employer" to the exclusion of the insurance carrier.

We note as a matter of more than passing interest that the courts in the *Fabricius* and *May* cases both examined the opinion of our Appellate Court in this instant case, (39 Ill. App. 2d 73,) and rejected its apparent conclusion that a statute such as Florida's was to be construed as equating the insurer with the employer in the matter of tort immunity.

Finally, in *Smith* v. *American Employers' Insurance Co.* 102 N.H. 530, 163 A.2d 564, when it was contended the subrogation provisions of the New Hampshire act disclosed a legislative intent to give the insurance carrier immunity from suit as a third party tort-feasor, the court responded (p. 567): "This contention fails to take into account the fact that the claim here against the carrier is for a tort allegedly committed by it as a third person against the plaintiff. Payment to the plaintiff by the defendant would not be under the policy nor in its status as a carrier, but rather as an independent third party. * * * So far as defendant is concerned, its alleged liability is not that of an employer, under the law, but one arising out of an alleged breach of a common-law duty."

And while Florida courts have not considered the effect of the lien and subrogation provisions insofar as they affect the common-law liability of a compensation carrier to an injured employee or his dependents, their decisions make it clear enough that those provisions are not to· be construed as limiting or depriving an employee of the right of action preserved to him against third party tort-feasors. In *Hartquist* v. *Tamiami Trail Tours, Inc.* 139 Fla. 328, 190 So. 533, where it was contended an employee could not maintain his common-law action because he had not given the notice required in the subrogation provision of the act, the court held that such requirement "was not intended to curtail or affect the existing remedies of the employee against the third party. Nor is it to be construed as a limitation upon the right of an employee to commence an action against a third person." Likewise, in *Frantz* v. *McBee Co.* (Fla.) 77 So.2d 796, the court brushed aside the idea that the subrogation provision of its act would prevent a common-law action against a co-employee, when it quoted from *Sylcox* v. *National Lead Co.* 225 Mo. App. 543, 38 S.W.2d 497, to say: "Such conclusion may lead to complications in the enforcement of the employer's right of subrogation, but

we nevertheless think it is the logical and necessary conclusion to be drawn from the language of our local act."

There are still other factors which militate against defendant's effort to gain tort immunity on this basis, not the least of which is the circumstance that as to 17 of the plaintiffs in this case defendant was not the insurer of their employers. Insofar as those plaintiffs are concerned, defendant is thus not possessed of the rights to subrogation, lien, commencement of suit or the other rights upon which its theory hinges. This circumstance, we believe, serves to emphasize the observation in both the *Smith,* (163 A.2d at 567,) and *Fabricius* cases, (121 N.W.2d at 364,) that the suits of the nature here prosecuted are not brought against defendant in its status of insurance carrier, or for the negligent performance of something it was required to do under the compensation act, but in its independent status as a tort-feasor for the negligent performance of a completely gratuitous act. *Cf. Schulz* v. *Standard Accident Ins. Co.* (D.C. Wash.) 125 F. Supp. 411, 415.

Nor, when the statutory differences and circumstances of suit are noted, is defendant aided by its extensive citation from other jurisdictions, notably *Sarber* v. *Aetna Life Insurance Co.* (9th cir.) 23 F.2d 434; *Hughes* v. *Maryland Casualty Co.* 229 Mo. App. 472, 76 S.W.2d 1101; *Schulz* v. *Standard Accident Insurance Co.* (D.C. Wash.) 125 F. Supp. 411; and *Martin* v. *Consolidated Casualty Ins. Co.* (5th cir.) 138 F.2d 896. In each case recovery was sought for injury or death resulting from aggravation of industrial injuries by the medical treatment of doctors furnished or employed by insurance carriers pursuant to policy or statutory obligation, in contrast to the present situation where the actions against defendant are based upon entirely gratuitous conduct. Of greater significance, however, were statutory provisions in each jurisdiction which either expressly charged insurance carriers with primary liability for the payment of compensation, or else permitted

the liability of the carrier to be substituted for that of the employer. Typical is the California statute involved in the *Sarber* case, which had this provision: "If the employer is insured against liability for compensation, and if after the suffering of any injury the insurer causes to be served on any compensation claimant a notice that it has assumed and agreed to pay any compensation to the claimant for which the employer is liable, *such employer shall be relieved of liability for compensation* to such claimant upon the filing of a copy of such notice with the Commission." (Schneider, Workmen's Compensation Statutes, Vol. 1, pp. 220-221; emphasis ours.) Another example is the Missouri statute under consideration in the *Hughes* case which provided; "If the employer be not insured his liability hereunder shall be primary and direct. *If he is insured his liability shall be secondary and his insurer shall be primarily and directly liable hereunder.*" (Mo. Stat. Anno., sec. 3325; emphasis ours.) The *ratio decidendi* in all of the cases was that since the acts expressly charged the carriers with the liability of an employer, the carrier was likewise entitled to the immunities of an employer.

The Florida act has no comparable provision which expressly makes the insurer primarily and directly liable to an injured employee, and neither does it make express provision which permits the liability of the insurer to be substituted for the liability of the employer. Defendant, however, in an effort to find application for its authorities, would have us read a legislative direction of primary liability into section 440.42 of the act, and a substitution of liability into section 440.41 (F.S.A. secs. 440.42 and 440.41). Apart from the effect of the Florida decisions holding that construction of the Florida act in derogation of the common-law rights of an employee is to be avoided wherever possible, (*e.g., Frantz* v. *McBee Co.* (Fla. 1955) 77 So.2d 796,) we find no substantive merit to defendant's contentions, particularly when it is remembered that

the Florida test for tort immunity is the duty and liability to secure compensation.

Section 440.41 (F.S.A. sec. 440.41) reads as follows: "In any case where the employer is not a self insurer, in order that the liability for compensation proposed by this chapter may be most effectively discharged by the employer, and in order that the administration of this chapter in respect of such liability may be facilitated, the Commission shall by regulation provide for the discharge, by the carrier for such employer, of such obligations and duties of the employer in respect of such liability, imposed by this chapter upon the employer, as it considers proper in order to effectuate the provisions of this chapter. For such purposes (1) notice to or knowledge of an employer of the occurrence of the injury shall be notice to or knowledge of the carrier; (2) jurisdiction of the employer by the Commission or any court under this chapter shall be jurisdiction of the carrier, and (3) any requirement by the Commission, or any Court under any compensation order, finding or decision shall be binding upon the carrier in the same manner and to the same extent as upon the employer."

Next in order section 440.42 (F.S.A. sec. 440.42) provides, with respect to insurance policies issued under the act: "Every policy or contract of insurance issued under authority of this chapter shall contain (a) a provision to carry out the provisions of Section 440.41, and (b) a provision that insolvency or bankruptcy of the employer and discharge therein shall not relieve the carrier from payment of compensation for disability or death sustained by an employee during the life of such policy or contract."

We think it clear that these sections do not reflect a legislative intent to place primary liability for compensation upon the insurer, or to permit the liability of the insurer to be substituted for the liability of the employer. In the first place, the sections simply do not deal with the subject matter, which was dealt with early in the act when the

legislature stated in section 440.10: "(1) Every employer coming within the provisions of this chapter, * * * shall be liable for and shall secure the payment to his employees of the compensation payable under sections." (F.S.A., sec. 440.10(1).) Instead, section 440.41 is, on its face, no more than an administrative provision relating to procedure wherein the legislature has authorized the Florida Commission, *as it deems proper,* to make regulations whereby the insurer may most effectively discharge the liability *"imposed* by this chapter *on the employer."* (Emphasis ours.) Liability is not transferred to the insurer, but an administrative facility is provided whereby the carrier may discharge the liability of the employer. Manifestly, if it had been the legislative intent to make the insurer primarily liable for compensation, there would have been no need to supply an administrative means for the insurer to discharge the insured's liability. The insurer is substituted for the employer, not as to the liability for and duty to secure compensation placed solely upon the employer in section 440.10, but only with respect to notice, jurisdiction and compliance with commission orders. As the court indicated in *Fabricius* v. *Montgomery Elevator Co.* (Iowa 1963) 121 N.W.2d 361, 366, under a comparable situation, such limited substitution for procedural purposes cannot be construed as taking away an employee's common-law action.

In like manner, section 440.42 manifests no intent to make the insurer primarily liable in derogation of what was said in section 440.10, but seeks only to control the contract obligation of the insurer to the end that the liability of the employer for compensation will not be defeated by the latter's insolvency or bankruptcy. Only by the most arduous of constructions could it be said that this section was intended to be a limitation on the right to a common-law action preserved to employees and their dependents in section 440.39 (1).

We conclude there is nothing in the Florida act which

reflects a legislative intent to equate the employer and the employer's insurer for all purposes, particularly as to immunity from suit as a third party tort-feasor, or, to state the proposition from another perspective, we find nothing in the act which serves to deprive an injured employee or his dependents of a common-law action against the employer's compensation carrier.

Subcontractors, for reasons which need not be stated in detail, enjoy immunity from suit as a third party tort-feasor under the Florida act, (*Miami Roofing & Sheet Metal Co.* v. *Kindt,* (Fla.) 48 So. 2d 840) and we are next confronted with defendant's second affirmative defense seeking to gain tort immunity on this ground. Defendant does not claim to have entered into a subcontract with Auchter, but its theory is that if it be found to have made safety inspections on the project as charged in plaintiffs' complaint, it became an employer on the project and entitled to the same immunity from common-law actions as other subcontractors and employers on the project. Florida decisions, however, negate the concept that defendant arose to the status of a subcontractor or employer on the project as the result of its gratuitous inspections.

The term "subcontractor" is not defined in the Florida act, but section 440.10 provides in part: "In case a contractor sublets any part or parts of his contract work to a subcontractor or contractors, all of the employees of such contractor and subcontractor or subcontractors engaged in such contract work shall be deemed to be employed in one and the same business, * * *." (F.S.A. sec. 440.10.) Upon two occasions the Florida Supreme Court has said with reference to this language: "The clear implication in this part of the Act is that there must be a contractual obligation on the part of the contractor, a portion of which he sublets to another. To 'sublet' means to 'underlet,' Webster's New International Dictionary; in the context in which it is here used, the effect of subletting is to pass on to an-

other *an obligation under a contract* for which the person so 'subletting' is primarily obligated." (Emphasis ours.) (*Street* v. *Safway Steel Scaffold Co.* (Fla. 1962) 148 So.2d 38, 42; *Jones* v. *Florida Power Corp.* (Fla. 1954) 72 So.2d 285, 289.) Not only was there no subletting here by Auchter to defendant, but Auchter's duty to provide a safe place of work for his employees and the employees of his subcontractors was not a contractual obligation, nor a part of the "contract work," and no theory of defendant could make it so.

By virtue of the language in section 440.10 and decisional evolution we do not deem it necessary to discuss, Florida has a "common employer" rule, the workings of which are best demonstrated by *Smith* v. *Poston Equipment Rentals, Inc.* (Fla.) 105 So.2d 578. In that case a general contractor rented a crane from Poston for use on a construction project and was loaned an operator and a helper to run the machine. Smith, an employee of the general contractor, was injured when the bucket fell from the crane, and brought a suit against Poston charging the operator and the helper with negligence. In holding that the compensation act was Smith's exclusive remedy, even though Poston was not a subcontractor, the court said (p. 579) : "If the men, who were lent as a part of the rental contract, were *actually engaged in the construction process under the direction of the general contractor,* they were for the purpose of this action statutory fellow servants under a 'common employer' who was liable to secure payment of workmen's compensation for all of them." (Emphasis supplied.) Defendant's efforts to take advantage of this decision and the "common employer" rule to gain tort immunity cannot succeed. Its employee, McClain, was not engaged in the "construction process" when he made his safety inspections; he was not under the direction or control of the general contractor; and, what is more, Auchter was not liable to secure the payment of compensation

for McClain. (See also: *Hartquist* v. *Tamiami Trail Tours, Inc.* 139 Fla. 328 190 So. 533.) More in point here is the Florida court's decision in *Goldstein* v. *Acme Concrete Co.* (Fla.) 103 So.2d 202, where it was held that the "common employer" rule did not extend to a materialman who was delivering ready-mixed concrete to a general contractor on a construction site. A compensation carrier, like a materialman, performs no part of the contract work, and, in this case, it is to be remembered that McClain remained under defendant's control and was on the site to serve defendant's purposes as well as those of its insured.

In accord with the policy of Florida that its compensation act is not to be interpreted as depriving one of a common-law right unless the statute clearly requires it, and in face of the conclusions reached under comparable acts in *Mays* v. *Liberty Mutual Insurance Co.* (3rd cir.) 323 F.2d 174; *Fabricius* v. *Montgomery Elevator Co.* (Iowa) 121 N.W.2d 361; and *Smith* v. *American Employers' Insurance Co.* 102 N.H. 530, 163 A.2d 564, we conclude that plaintiffs' suits against defendant were not denied to them by the Florida Workmen's Compensation Act.

As was true in the *Mays, Fabricius* and *Smith* cases, the defendant and *amici curiae* press the argument that it would be contrary to public policy to permit recovery against a compensation carrier as a third party tort-feasor, contending that the result will be a curtailment of safety inspections to the ultimate detriment of working men and their families. This appeal has been soundly rejected in the cited cases and we see little purpose in repeating or expanding upon the reasoning and logic found in them, except to add that the scope and value of the safety inspections, represented thus in an effort to sustain this contention, are highly inconsistent with defendant's claims under the negligence phase of the case that the activity of its safety engineer was only "casual observation," for its own purposes. Furthermore, whether we look to the law

of Florida or Illinois, such a question of public policy is for the legislature not for the courts. *General Properties Co.* v. *Greening,* 154 Fla. 814, 18 So.2d 908; *Illinois Western Electric Co.* v. *Town of Cicero,* 282 Ill. 468; *People ex rel. Carruthers* v. *Cooper,* 404 Ill. 395.

The Appellate Court, having found that no common-law action was proved against defendant and apparently considering its treatment of the affirmative defense as decisional, declined to pass upon "certain trial errors," (39 Ill. App. 2d at 135,) advanced by defendant as entitling it to a new trial. Defendant, relying upon *Foreman* v. *Holsman,* 10 Ill. 2d 551, *People ex rel. Hahn* v. *Hurley,* 9 Ill. 2d 74, and similar decisions, now insists that the cause be remanded to the Appellate Court "to pass upon serious issues that were not passed upon by the Appellate Court, particularly the errors assigned by American Mutual for a new trial." Upon leave granted plaintiffs, the briefs of the parties presented in the Appellate Court have been filed with the record here, (*Cf. Chicago City Railway Co.* v. *Schmidt,* 217 Ill. 396,) and within its reference to "serious issues" we presume defendant includes the questions of privity, control of premises and public policy which, although fully briefed and argued in the Appellate Court, were not resolved or touched upon in its opinion. However, under the privilege accorded defendant to sustain the judgment of the Appellate Court upon any ground justified by the record, (*Mueller* v. *Elm Park Hotel Co.,* 391 Ill. 391, 398-399; *Becker* v. *Billings,* 304 Ill. 190, 205) it has fully briefed and argued those issues here and we have decided them. As to those issues, therefore, there is no need or purpose for remandment. Plaintiffs, pointing to the manner in which defendant has here presented some of the issues not passed upon by the Appellate Court while omitting others, contend that the latter have been waived and charge defendant with "preserving" some of the errors not passed upon by the Appellate Court in an effort to

maintain a basis for remandment against the eventuality of reversal by the court. We think this contention is not entirely devoid of merit. However, putting this feature with other circumstances of the case, we believe our jurisdiction and discretion are best exercised by considering the trial errors urged by defendant and finally disposing of the case. Particularly is this true, since they present questions of law rather than determinations of fact which would require us to remand. See: *Armstrong Paint and Varnish Works* v. *Continental Can Co.*, 301 Ill. 102, 111; *Logan* v. *Mutual Life Ins. Co. of New York*, 293 Ill. 510, 514-515.

It is abundantly clear that this court possesses the power and jurisdiction to determine the remaining issues. Section 75 of the Civil Practice Act provides that judgments of the Appellate Court are final, except when a certificate of importance is granted by that court or leave to appeal is granted by this court, and then continues: "In any such case as is hereinbefore made final in the Appellate Court it is competent for the Supreme Court to grant leave to appeal for its review and determination *with the same power and authority in the case, and with like effect, as if it had been carried by appeal to the Supreme Court.*" (Ill. Rev. Stat. 1961, chap. 110, par. 75(2); emphasis ours.) Again in section 92 of the act, entitled "Powers of reviewing courts," it is provided: "(1) In all appeals the reviewing court *may, in its discretion, and on such terms as it deems just,* * * * (e) Give any judgment and make any order which ought to have been given or made, * * * that the case may require." (Ill. Rev. Stat. 1961, chap. 110, par. 92(1)(e); emphasis ours.) Further it has frequently been indicated that where this court acquires jurisdiction for any reason, it has jurisdiction to pass upon all questions, except those requiring a weighing of the evidence, proper to be passed upon and disposed of in the case. (*Goodrich* v. *Sprague*, 376 Ill. 80; *Bowman* v. *Illinois Central Railroad Co.*, 11 Ill. 2d 186.) Aside from consid-.

erations going to the avoidance of multiplicity of appeals, there are in our opinion unique circumstances here which, as a matter of discretion and justice, impel us to use our powers on review to the utmost and to finally dispose of the case.

The record filed indicates that after a jury trial of some 13 weeks, judgments were entered in this proceeding on December 14, 1959. Appellate processes have thus consumed a period in excess of four years, during the greater part of which the matter was at issue in the Appellate Court. Although not a conclusive basis for the exercise of our jurisdiction, the desirable purpose of bringing prolonged litigation to an end and the injustices and hardship further delay would work on both sides to the litigation are in our opinion matters worthy of consideration. However, there is a more compelling reason which impels the exercise of our jurisdiction found in the circumstance that one of the three judges before whom the matter was heard in the Appellate Court disqualified himself and "took no part" in the decision of the case. (39 Ill. App.2d at 135.) Section 7 of the Appellate Courts Act provides that two judges shall constitute a quorum and that the concurrence of two "shall be necessary" to every decision. (Ill. Rev. Stat. 1961, chap. 37, par. 31.) Remandment to the two-judge court would thus be impregnated with the possibility that the necessary concurrence could not be reached upon the remaining issues. Should that occur, final disposition, one way or the other, would be greatly delayed in the morass of procedural difficulties that would follow and in all probability would eventually become the task of this court. Since we have the jurisdiction and discretion to act, we believe that justice and public policy require us to do so, rather than to expose the parties to further delay and the uncertainties created by the withdrawal of one Appellate Court judge.

Prior to the occurrence here the city of Jacksonville,

Florida, passed an ordinance which adopted by reference a building code known as the "National Building Code," and also an ordinance adopting by reference the "American Standard Safety Code for Elevators, Dumbwaiters and Escalators" compiled by the American Standards Association. These ordinances were introduced in evidence by plaintiffs, and counsel for plaintiffs and the co-defendants Union Wire and Archer Iron were permitted to read portions thereof to the jury, over repeated objections by defendant American Mutual, first, that neither code applied to construction hoists, and second that the ordinances were invalid and did not come into effect because a State statute had pre-empted the field of elevator regulation. The ruling on this evidence is complained of, the defendant raising the same contentions on appeal. The first point, however, was not raised in defendant's written motion for a new trial so as to preserve it for review and will not be considered. Where a party files a motion in writing for a new trial, specifying therein the grounds or reasons for such motion, he will be restricted, in a court of review, to the grounds or reasons specified in such written motion and will be deemed to have waived all other grounds or reasons for a new trial. (*County Board of School Trustees* v. *Batchelder,* 7 Ill. 2d 178, 183-184; *Lukich* v. *Angeli,* 31 Ill. App. 2d 20, 28.) As the matter comes to us, the ruling of the trial court that the ordinances had application to construction hoists cannot be questioned.

We also find to be without merit the contention that the ordinances were invalid and without effect because a Florida statute had pre-empted the field of elevator regulation, (or the "operation of construction hoists" as the point is stated in the motion for a new trial.) Section 399.01(2) of the Florida Elevator Law upon which defendant relies, (F.S.A., sec. 399.01(2),) expressly exempts construction hoists from its application. This being so, it cannot be said that the ordinances, found by the

trial court to have application to construction hoists, were void as being in conflict with the State law.

Over defendant's objection that they were immaterial and irrelevant, the trial court admitted into evidence copies of twenty-nine advertisements placed by defendant at various times in national or trade publications. Collectively, they are referred to in the record as the "Mr. Friendly" advertisements and, as previously noted, each one, in varying language, proclaimed that defendant's safety engineers worked hand-in-hand with insureds to "build safety into every job," while one represented that its safety engineers made "thorough inspection and hazard analysis." In light of defendant's answer which denied that it had undertaken to make surveys or inspections, and its repeated allegations that the "visits" and inspections were solely for its own purposes of keeping informed and advised on the risk, such evidence was admissible.

As a general rule any statement, written or not, made by a party or in his behalf which is inconsistent with his present position may be introduced in evidence against him. (Conrad, Modern Trial Evidence, vol. 1, sec. 454; Cleary, Handbook of Illinois Evidence, sec. 13.10; *Brown* v. *Calumet River Railway Co.*, 125 Ill. 600.) Where the question has arisen, authorities are in accord that advertisements, brochures, newspaper items, catalogs, and the like are admissible and relevant to the subject matter of the suit where they contain statements of a party inconsistent with a claim or a position asserted by such party in the action. (*Henkle* v. *Smith,* 21 Ill. 237; 20 Am. Jur. Evidence, 1960 Supp. p. 152; 44 A.L.R. 2d 1031; *Hartford Steam Boiler Inspection & Insurance Co.* v. *Pabst Brewing Co.* (7th cir.) 201 F. 617, 629; *Fryer* v. *New York Brokerage Co.* 152 Iowa 688, 133 N.W. 110; *cf. Mahlstedt* v. *Ideal Lighting Co.* 271 Ill. 154.) In the present case the scope and purposes of the visits of defendant's safety engineers as alleged in its answer to the complaint were completely inconsistent with

its representations in the advertisements. Under the rule stated above, the advertisements became relevant and material and were properly admitted into evidence.

Although defendant adopts the position that the cause must be remanded to the Appellate Court to pass upon the admissibility of the advertisements, it has, in its brief here, inconsistently presented argument that some of the advertisements were inadmissible because they were published subsequent to the occurrence, and has cited *Ulwelling* v. *Crown Coach Corp.* 23 Cal. Reptr. 631, as authority for its claim that its advertisements were immaterial and irrelevant. Neither point is well taken. Our examination of the record shows that but one of the advertisements was published subsequent to the occurrence, and that no objection was made to it on such ground at the trial. Defendant's objection therefore, comes too late for the first time on appeal. (*Town of Cicero* v. *Industrial Com.*, 404 Ill. 487, 495; *Goldberg* v. *Capitol Freight Lines, Ltd.*, 382 Ill. 283.) Nor is the *Ulwelling* case authority for the inadmissibility of the advertisements for the purpose for which they were received in this case. Its only holding was that advertising representation would not support a theory of an implied contract to inspect. Plaintiffs here have never founded their suits on contract, express or implied, even as an alternative theory of recovery.

Defendant pleaded as a defense that plaintiffs "without the exercise of due care for their own safety, voluntarily assumed the risk" of riding the hoist alleging they knew it was unsafe for the transportation of passengers because of the "total absence" of handrails, barriers, gates and other safeguards, because of the nature, design and construction of said materials hoist, and because of its location on the exterior of the building and it was not enclosed within a shaft. Error is now claimed because the trial court struck this defense on plaintiffs' motion, made at the close of plaintiffs' evidence, and because it denied defendant's motion,

made at the close of all the evidence, to vacate its order. Some merit attaches, we believe, to plaintiffs' assertion that defendant's pleading erroneously commingles the doctrines of contributory negligence and assumption of the risk. (See: *Byers* v. *Gunn,* (Fla. 1955) 81 So.2d 723, 727; *Florida Gravel Co.* v. *Davis,* 126 Fla. 64, 170 So. 660, 663.) However, it is enough to say that the defense was properly stricken when we look to the controlling Florida decisions. In *Bartholf* v. *Baker,* (Fla. 1954) 71 So.2d 480, 483, it was said: "Voluntary exposure is the bed rock upon which the doctrine of assumed risk rests. Appreciation of danger is an essential to the defense of assumption of the risk, * * * *as is knowledge of the condition which creates the risk."* (See also: *City of Williston* v. *Cribbs,* (Fla. 1955) 82 So.2d 150; *Wilson-Toomer Fertilizer Co.* v. *Lee* 90 Fla. 632, 106 So. 462, 465-466; *Gallespie* v. *Thornton,* 95 Fla. 5, 117 So. 714, 717.) Here, there was neither pleading nor proof that plaintiffs had knowledge of the unsafe cable and sheaves or of the inadequate safety devices which created the risk. Without knowledge of such defects, and a condition of mental willingness to ride the hoist despite them, plaintiffs cannot be said to have legally assumed the risk. *Smith* v. *Kelly, Inc.* (D.C. cir.) 275 F.2d 169; *Youngblood* v. *Beck Co.* 93 Ga. App. 451, 91 S.E.2d 796.

Defendant also complains of instructions both given and refused and contends that the trial court unfairly gave only 5 of the 39 instructions it tendered. We believe it would be purposeless to prolong this opinion by a detailed discussion of each separate instruction. The record discloses a lengthy and painstaking conference on instructions, and our examination of the specific instructions here complained of reveals no reversible error. This is particularly true when all of the given instructions are read and considered as a series. Nor do we find unfairness to defendant in the matter of instructions. The giving of exces-

sive instructions has been repeatedly condemned as tending to reduce the effectiveness of the jury, (*Borst* v. *Langsdale,* 8 Ill. App. 2d 88; *May* v. *Marty,* 323 Ill. App. 656,) and we note here that defendant has sought to justify but 5 of its 34 instructions that were refused.

The ultimate question here is not whether the trial was scrupulously free from error, but whether any error occurred which operated to the prejudice of the defendant or unduly affected the outcome below. Considering the evidence which supports the jury's verdict, as well as the law applicable to the alleged trial errors raised here, it is our conclusion that there is no error which would justify a reversal in this case.

For the reasons stated the judgment of the Appellate Court is affirmed insofar as it relates to defendants Union Wire Rope Corporation and Archer Iron Works. As to the defendant American Mutual, however, its judgment is reversed and the judgments of the superior court in favor of plaintiffs are affirmed.

> *Appellate Court affirmed in part and reversed in part; superior court affirmed.*

Mr. JUSTICE SCHAEFER concurring in part and dissenting in part:

I concur in the opinion of the court with respect to its disposition of the actions against Union Wire Rope Corporation and Archer Iron Works, but I dissent from its disposition of the action against American Mutual Liability Insurance Company.

As the opinion of the appellate court pointed out, (39 Ill. App. 2d at 125, 187 N.E.2d at 449) the evidence in this case did not establish that either the contractor or the plaintiffs relied upon the inspections made by the defendant. The opinion of this court eliminates this obstacle to recovery by dispensing with the necessity for any element of reliance, holding that the plaintiffs may recover without proof that

anyone relied upon the defendant to inspect the hoist. The result is that an insurer who makes supplemental inspections, designed to minimize potential losses by diminishing the likelihood of injury, is penalized by the imposition of full responsbility for all losses that might have been revealed by the most complete inspection, even though no one concerned relied upon the insurance company for complete inspection.

The opinion thus apparently announces a kind of "all or nothing" rule of law that will frustrate the possibility of limited inspection services by requiring that if any inspections are undertaken, complete inspections must be made. In the absence of proof of reliance, or of what may be the same thing, proof that the defendant caused the contractor to refrain from performing its duty to inspect, I would not hold that because the insurance company made a partial inspection of the hoist it is liable for failing to discover and disclose that which a complete inspection should have revealed.

The three cases so heavily relied upon in the opinion of the court, "the *Smith, Pabst* and *Van Winkle* cases," did not, as I read them, impose such a rule of law. They appear rather to have measured the scope of the duty imposed by the scope of the undertaking assumed, or reasonably thought by others to have been assumed. The opinion repeatedly quotes from the earliest of them, *Van Winkle* v. *American Steam-Boiler Ins. Co.* 52 N.J.L. 240, 19 Alt. 472 (1890), the expression that the duty arose "as soon as it (the defendant) took part, practically, in the management of this machine." This quotation needs amplification. The conduct that was referred to "as taking part, practically, in the management of the machine," involved inspections of the boiler and the furnishing "for the guidance of the engineer of the assured," of certificates defining the load that could be put on the safety valve. "What this defendant did was this: It cooperated with the owner of this dangerous instrument in a

particular indispensable to its safe use, and it thereby in that degree constituted itself the agent or the substitute of such owner." (19 Atl. at 474.) There was no comparable "substitution" in the present case.

In *Hartford Steam Boiler Inspection & Ins. Co.* v. *Pabst Brewing Co.*, 201 Fed. 617, 628-9 (C.C.A. 7, 1912) the circuit court of appeals stated: "The law casts upon the owner of the boilers when in use, as instrumentalities of danger, the duty to inspect and care for their safety, for protection of the public; and, of course, the owner may delegate the inspection and care to competent employees or other agency (or both) remaining answerable for their negligent performance. As foundation for the present charge of liability, however, it is contended that the duty of inspection was assumed by the Insurance Company, as an undertaking outside the insurance contract and its purposes, *to relieve the Brewing Company of performance thereof, and all inspections were so made and relied upon for safety in use of the boiler up to the time of the explosion.* Thus the question arises: Can liability be so predicated, at the side of the insurance contract, and without other consideration, for alleged negligent inspection? * * * We are of opinion that these facts of continuous conduct on the part of the Insurance Company in reference to the inspections and their purpose—if relied upon by the Brewing Company and so understood by the Insurance Company, as alleged—are of probative force to show both the undertaking of duty and relation of the parties upon which the action for negligence in performance thereof may be predicated." (Emphasis supplied.) In the case before us there was no reliance, nor was there any indication that the activities of the insurance company were to relieve the contractor of its duty to inspect.

The three to two decision of the Supreme Court of New Hampshire in *Smith* v. *American Employers Insurance Co.*, 102 N.H. 530, 163 A. 2d 564, comes closer to the present case. But that case arose upon a motion to dismiss, and as

the "essential allegations" of the plaintiff's complaint, which are referred to in the opinion on rehearing, are not set forth in the opinions of the New Hampshire court, or with clarity in the record of the case insofar as the researches of the parties before us have disclosed, it is difficult to appraise its actual significance.

The decision of this court can not therefore be said to be dictated by precedent, and as a matter of policy I think that it is unsound. When there has been reliance, or when the insurer has taken over the inspection duties of another, there should be liability. But in the absence of those circumstances, I am unable to see any sound reason for imposing liability.

Mr. JUSTICE UNDERWOOD joins in this dissent.

Mr. JUSTICE HOUSE also dissenting:

I concur in the minority opinion of Mr. Justice Schaefer. Under the stringent rule adopted by the majority no insurer will hereafter dare offer to perform, or perform, limited inspection services for fear of incurring liability. Undoubtedly such services, though limited, have contributed to the safety of workers and prevented economic loss. Sound policy would seem to dictate that the kind of service rendered by this insurer should be encouraged rather than discouraged.